S.E.W. FRIEL COMPANY AND CHARLES DUDLEY TURNER, PLAINTIFFS-APPELLANTS, v. NEW JERSEY TURNPIKE AUTHORITY, DEFENDANT-RESPONDENT.

Argued January 24, 1977—Decided April 20, 1977.

108

*Mr. Dennis J. Drasco* argued the cause for plaintiffs-appellants (*Messrs, Lum, Biunno & Tompkins,* attorneys).

*Mr. William H. Graham* argued the cause for defendant-respondent (*Messrs. McElroy, Connell, Foley & Geiser,* attorneys).

The opinion of the court was delivered by

CLIFFORD, J. The trial court denied plaintiffs' motion for leave to file a late notice of claim pursuant to the appropriate section (*N. J. S. A.* 59:8–9) of the New Jersey Tort Claims Act, *N. J. S. A.* 59:1–1 *et seq.* (Supp. 1976–77). The Appellate Division, in an unreported opinion, affirmed, holding that (a) the defendant New Jersey Turnpike Authority was a public entity within the meaning of the Tort Claims Act; (b) therefore the provision of the Act barring subrogation actions (*N. J. S. A.* 59:9–2(e)) served to preclude the claims of plaintiff S.E.W. Friel Company; and (c) the personal injury claim of plaintiff Charles Dudley Turner was foreclosed because he had not sought permission to file a late claim within one year from the date that his cause of action had accrued, as required by the statute.[1]

---

[1] *N. J. S. A.* 59:8–8 entitled "Time for presentation of claims," reads as follows:

A claim relating to a cause of action for death or for injury to person or to property shall be presented as provided in this chapter not later than the ninetieth day after accrual of the cause of action. After the expiration of 6 months from the date notice of claim is received, the claimant may file suit in an appropriate court of law. The claimant shall be forever barred from recovering against a public entity if:

We granted certification, 70 *N. J.* 520 (1976), to review these determinations.

## I

Plaintiff Turner suffered personal injuries as the result of a multi-vehicle accident on the New Jersey Turnpike on October 24, 1973 while he was driving a truck of his employer, plaintiff Friel. Both the truck and its cargo sustained damage. Friel's insurance carrier, Underwriters Adjusting Company, sought to pursue its subrogation claims, it having paid Friel on account of the vehicle and cargo damages and also on account of the ongoing workers' compensation claim of Turner. To that end it retained the law firm of Lum, Biunno & Tompkins.

On October 7, 1974, more than eleven months after the accident, that firm brought a motion on behalf of both plaintiffs seeking leave to file a late notice of claim pursuant to *N. J. S. A.* 59:8–9. Accompanying the notice of

(a) He failed to file his claim with the public entity within 90 days of accrual of his claim except as otherwise provided in section 59:8–9; or

(b) Two years have elapsed since the accrual of the claim; or

(c) The claimant or his authorized representative entered into a settlement agreement with respect to the claim.

Nothing in this section shall prohibit an infant or incompetent person from commencing an action under this act within the time limitations contained herein, after his coming to or being of full age and sane mind.

This is followed by *N. J. S. A.* 59:8–9, "Notice of late claim":

A claimant who fails to file notice of his claim within 90 days as provided in section 59:8–8 of this act, may, in the discretion of a judge of the superior court, be permitted to file such notice at any time within 1 year after the accrual of his claim provided that the public entity has not been substantially prejudiced thereby. Application to the court for permission to file a late notice of claim shall be made upon motion based upon affidavits showing sufficient reasons for his failure to file notice of claim within the period of time prescribed by section 59:8–8 of this act; provided that in no event may any suit against a public entity arising under this act be filed later than 2 years from the time of the accrual of the claim.

motion was an affidavit dated October 3, 1974, of Dennis F. Drasco, an attorney associated with the firm, setting forth, *inter alia,* that both the plaintiffs and the insurance carrier were non-residents of New Jersey; that the settlement of the Friel property damage claim did not take place until more than 90 days after the date of the accident; and that plaintiff Turner sustained "multiple fractures of the arms, ribs and skull and had his spleen removed." The affidavit noted particularly that the workers' compensation claim had not been concluded, and continued:

[A]lthough I have attempted to ascertain whether Mr. Turner has retained counsel in New Jersey for purposes of bringing a personal injury action on his own behalf, neither he nor his Workmen's Compensation attorney has responded. This Motion is made to protect both Underwriters' interests and Mr. Turner's since he no doubt will bring a third party action above that which Underwriters is entitled to in subrogation of any Workmen's Compensation judgment awarded.

Also made part of the moving papers was a Notice of Claim which disclosed that Turner had incurred bills of over $2500 for surgery and over $6500 for hospitalization.

Mr. Drasco further recited his legal position that it was unnecessary to file a notice of claim against the New Jersey Turnpike Authority because the Authority did not "come within the purview of the Tort Claims Act"; but that, in effect, leave was being sought to file a late notice *ex abundanti cautela.*

The motion was returnable on October 18, 1974, still within one year of the accident. It was adjourned from that date to October 25, 1974, to be heard along with several other motions on cases relative to the same occurrence (now commonly referred to as the "Turnpike accidents"); and by agreement of counsel the court undertook to consider the motion on the papers submitted, without oral argument. The trial judge reserved decision and filed an opinion on January 8, 1975, holding that the Turnpike Authority is within the provisions of the Act. He denied

the motion as to plaintiff Friel because of the statutory prohibition against subrogation claims, and as to plaintiff Turner because the information contained in the notice of claim was "not sufficient." A letter making slight amendment to the opinion was filed on January 10, 1975.

Thereafter plaintiffs moved under *R.* 4:50–1 "for relief from" the decision denying their applications; their intention being "to clarify the issues on the initial application and not * * * as a separate application." The moving papers were accompanied by an affidavit of plaintiff Turner and by another affidavit from Mr. Drasco. Turner's document related that he was taken from the accident scene to Christ Memorial Hospital, Jersey City, where he remained in critical condition in intensive care from October 24, 1973 until December 5, 1973; that thereafter he retained a Maryland attorney to prosecute his workers' compensation claim (Turner was a resident of Maryland and his employer, Friel, likewise had its home office in Maryland) ; that prior to October 24, 1974 he told his Maryland attorney he wanted to institute suit in New Jersey against all potential negligent parties; that he asked the attorney to "inquire whether the firm of Lum, Biunno & Tompkins, which had entered the case on behalf of [his] employer to protect their subrogation and lien interest, would be interested and willing to represent [his] interests and bring a personal injury action * * * against all potential negligent parties"; and that he had since been assured by that firm of their representation. Turner further averred that as a resident of Maryland he was unaware of New Jersey's Tort Claims Act and particularly of its notice provisions; that as he was totally incapacitated for longer than the statutory 90 days period, he did not consult with the workers' compensation carrier until after the 90 days had elapsed; and that as a consequence of his injuries he was confined to his home, after release from the hospital, until October, 1974.

Mr. Drasco's affidavit related that at the time he had made his earlier affidavit in October, 1974, he had not yet dis-

cussed the matter with Turner; but that during the pendency of the motion to file a late notice of claim he was able to communicate with Turner, who retained the firm to prosecute his personal injury action. On the basis of this additional information plaintiff Turner asked the trial court to allow the filing of a late notice of claim. After further argument this motion too was denied, the trial judge now taking the position that his earlier conclusion had stemmed from there being "nothing before me in that original application from Turner at all and that is why I denied it."[2]

An appropriate order was filed barring all plaintiffs' claims. As indicated heretofore, the Appellate Division affirmed.

## II

■ To the extent that the court below held that the New Jersey Turnpike Authority was a public entity within the meaning of the Tort Claims Act and that plaintiff Friel Company's claims were barred by reason of the prohibition against subrogation claims, the judgment is affirmed.

In response to the somewhat haphazard and even arbitrary treatment the historical "general rule" of sovereign immunity had received,[3] the Legislature, by L. 1967, c. 20, §

---

[2]Significantly, however, in his earlier written opinion the trial judge, in discussing the claims of Turner and Friel, had referred to Drasco as "their attorney."

[3]Before July 1, 1972, the effective date of those portions of the Tort Claims Act with which we are here concerned, sovereign immunity had been the general rule in New Jersey. *Fitzgerald v. Palmer*, 47 *N. J.* 106 (1966). Nevertheless, it had been judicially abrogated to a great extent for local governmental units, and the State itself had in fact been subjected to suit in various types of actions, *e. g.*, to compel condemnation, *Haycock v. Jannarone*, 99 *N. J. L.* 183 (E. & A. 1923); to compel performance by way of prerogative writ, *O'Neill v. State Highway Dept.*, 77 *N. J. Super.* 262, *rev'd on other grounds*, 40 *N. J.* 326 (1962); to restrain uncon-

1, directed the Office of the Attorney General to conduct a study and to make recommendations. In the *Report of the Attorney General's Task Force on Sovereign Immunity* (May 1972) (hereinafter *Report*) the Attorney General noted that

> * * * an examination of the rather haphazard approach to government liability extant in the State of New Jersey today provides convincing evidence that only a *comprehensive* and *uniform* statute which applies to all governmental entities — whether local or State — *including public authorities*, will provide for the development of an intelligent and uniform body of governmental tort law in the State of New Jersey (emphasis in original and added).
>
> [*Report, supra,* at 11.]

The Attorney General therefore recommended that the Legislature

> enact a uniform and comprehensive tort claim act providing the statutory framework for adjudicating the liability of *all public entities* throughout the State of New Jersey. * * * The proposed Act would *reestablish the immunity* of all public entities in the State of New Jersey *subject to liabilities* set out in reasonable detail in the statute (emphasis in original).
>
> [*Id.* at 10.]

The New Jersey Tort Claims Act, *N. J. S. A.* 59 :1–1 *et seq.* was promulgated in 1972, consistent with the Report.

It is undisputed that the accident in question occurred after the effective date of the Act. Therefore, the notice

---

stitutional action by the State, *Wilson v. State Water Supp. Comm.,* 84 *N. J. Eq.* 159 (E. & A. 1915) ; or to compel payment of local taxes on property condemned for public use, *East Orange v. Palmer,* 47 *N. J.* 307 (1966). Additionally, the legislation establishing the existence of more than 180 various State agencies and local government entities provided that these entities "may sue and be sued." *Report of the Attorney General's Task Force on Sovereign Immunity,* 30–34 (May 1972). *See, e. g., N. J. S. A.* 27 :23–5 (d) — New Jersey Turnpike Authority. In *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454, 468–71 (1956), this Court held that this grant of the power to sue and be sued constituted a consent to suits, including tort actions, against any such agency so authorized.

and subrogation provisions apply if the defendant, New Jersey Turnpike Authority, is within the purview of the Act.

*N. J. S. A.* 59:1–3, the definitions section, provides that

"Public entity" includes the *State, and* any county, municipality, district, *public authority*, public agency, and any other political subdivision or public body in the State (emphasis added).

and that

"State" shall mean the State and any office, *department*, division, bureau, board, commission or agency of the State, but *shall not include any such entity which is statutorily authorized to sue and be sued* (emphasis added).

As was said in *English v. Newark Housing Authority,* 138 *N. J. Super.* 425, 428 (App. Div. 1976), "It seems clear from the language of that act that the Legislature intended to deal with the whole area of sovereign immunity in this one statute." Nevertheless, plaintiffs contend that because the Turnpike Authority was established in the *Department* of Transportation effective February 21, 1973 (*N. J. S. A.* 27:23–3 (Supp. 1976–77)) and has the power to "sue and be sued in its own name" (*N. J. S. A.* 27:23–5(d)), it falls within the definition of "State" but is excluded from the coverage of the Act by virtue of the last phrase of the definition. This argument strains logic and is contrary to both legislative intent and case precedent.

The definitional section of public entity by its terms includes public authorities as entities separate from the "State." Therefore, the exclusionary proviso in the definition of State appears to be merely a reiteration of the separateness from the State of public authorities which have statutory power to sue even if they are nominally within a department of the State. Or as Judge Breslin said in *Wade v. N. J. Turnpike Auth.,* 132 *N. J. Super.* 92, 97–98 (Law Div. 1975):

The two definitions, "Public entity" and "State" should be viewed as follows: the former is a greater inclusive grouping based on sovereignty, i. e. political subdivisons: the second is a lesser included sub-grouping based on administrative subdivisions of the State. "State" then is but one of the public entities listed in the former definition. "Public entity" is the general term, "State" is a specific. Each of the parts included under the term "Public entity" has had that sovereignty possessed by the State parcelled out to it, and is to that degree independent of the State, and the equal of the State. The administrative parts that are listed in the meaning of "State", however, merely share in or are covered by the umbrella of sovereignty which the State has retained \* \* \*. These include offices, departments, divisions, bureaus, boards, commissions and state agencies. \* \* \* Unless a moving party can demonstrate that the Turnpike Authority is an office, department, division, bureau, board, commission or state agency, then the said exclusion contained in the definition of "State" does not apply to the Turnpike Authority. On the other hand, the Turnpike Authority clearly fits under the definition of "Public entities", namely as a public authority.

In addition, the Comment to section 59:1–3 explicitly states that

[t]he definition of "Public Entity" provided in this section is intended to be *all inclusive* and to apply uniformly throughout the State of New Jersey to *all entities exercising governmental functions* (emphasis added).

The enabling legislation for the Turnpike Authority states that

[t]he *authority* is hereby constituted an instrumentality *exercising public* and essential *governmental functions,* \* \* \*.
[*N. J. S. A.* 27:23–3(A) (emphasis added).]

And to make assurance doubly sure, the remainder of the Comment leaves no room for doubt:

For the purposes of establishing liability in the State of New Jersey this definition [of "Public Entity"] is specifically intended to include such entities as the New Jersey Highway Authority and *Turnpike Authority* and Rutgers the State University (emphasis added).

In *Dependable Container Service, Inc. v. N. J. Turnpike Auth.,* 135 *N. J. Super.* 238, 239 (App. Div. 1975), relied on by the court below, it was determined that

[t]he New Jersey Turnpike Authority is so plainly and clearly a public entity within the meaning of that term as defined in *N. J. S. A.* 59:1-3, as to leave no room for construction.

Nevertheless, plaintiffs ask for the alternate construction on the ground that the 1973 amendment which placed the Turnpike Authority within the *Department* of Transportation simultaneously removed it from the definition of public entity. But that amendment dealt merely with a nominal change. The Turnpike Authority was "moved" from the State Highway Department to the Department of Transportation. The amendment in no way affected the status of the Turnpike Authority as a public authority with governmental functions, *i. e.,* a public entity. Moreover, the grant of the power to sue and be sued remained, thus continuing the exclusion of the Turnpike Authority from the definition of State.

Plaintiffs further contend that *Briscoe v. Rutgers,* 130 *N. J. Super.* 493 (Law Div. 1974), supports the theory that the Turnpike Authority is beyond the reach of the Act. The trial judge in *Briscoe* held that Rutgers University was not within the ambit of *N. J. S. A.* 59:13-1 *et seq.,* the New Jersey Contractual Liability Act, because its power to sue and be sued excludes it from the definition of "State," the operational term in that Act. Thus, plaintiffs argue that the Turnpike Authority, like Rutgers University, is likewise excepted from the Tort Claims Act, as well as from the Contractual Liability Act. However, *Briscoe* is inapposite. The Contractual Liability Act refers only to the "State"; "public entities" is the operational term of the Tort Claims Act. The exception of Rutgers University and the Turnpike Authority from the definition of State and, therefore, from the Contractual Li-

ability Act does not exclude them from the coverage of the Tort Claims Act, particularly in the face of the Comment to *N. J. S. A.* 59:1-3 referred to above. In fact, Judge Dwyer in *Briscoe* specifically mentioned that his resolution of the problem under the Contractual Liability Act was not related to the Tort Claims Act. *Briscoe, supra* at 506.

We are satisfied that the Turnpike Authority is clearly within the purview of the Act. Therefore, the notice provisions (see n. 1, *supra*) are applicable to both plaintiffs' attempted suits; and the prohibition against subrogation claims found in *N. J. S. A.* 59:9-2(e) serves to bar the claims of plaintiff Friel.

### III

Turning now to the Appellate Division's determination that the trial court properly denied plaintiff Turner's application to file a late notice as having been presented beyond the one year period allowed (in some circumstances) by statute, we take note first of the Act's requirement that normally a claim must be presented within 90 days from the date the cause of action accrues. *N. J. S. A.* 59:8-8. The rationale underlying this provision for timely notice is said to be twofold: "to expedite investigation with the hope of reaching nonjudicial settlement and to protect the public entity's access to current information about the incident giving rise to the claim." *Reale v. Twp. of Wayne,* 132 *N. J. Super.* 100, 109 (Law Div. 1975). See also *Dambro v. Union Cty. Pk. Comm.,* 130 *N. J. Super.* 450, 455 (Law Div. 1974); Comment to *N. J. S. A.* 59:8-3; *Report, supra,* 230.

However, in order to avoid the injustice which might in some instances result from unyielding application of this timely notice provision, a relief mechanism was included in the Act, *Pinckney v. City of Jersey City,* 140 *N. J. Super.* 96, 98 (Law Div. 1976). Hence, notwithstanding the 90-day rule, a claimant may, in the discretion of a judge of

the Superior Court and upon a showing of "sufficient reasons", be permitted to file such notice within a year after the accrual of his claim provided the public entity has not been substantially prejudiced by the delay. *N. J. S. A.* 59: 8–9.

We need not tarry long over the "prejudice" ingredient. The Turnpike Authority does not contend, as indeed it could not, that it has suffered any prejudice, let alone substantial prejudice, by the delay. The "Turnpike accidents" were hardly an "obscure event, unknown and unnoticed by all but plaintiff." *See Marino v. Union City,* 136 *N. J. Super.* 233, 241 (Law Div. 1975). In *Wade v. N. J. Turnpike Auth., supra,* a case involving the same occurrence, we are informed that 66 vehicles were involved in this disaster, resulting in deaths of nine persons and and injuries to 37 others. There was extensive news coverage. The National Safety Board conducted hearings. The Turnpike Authority and State Police participated directly in the investigation. 132 *N. J. Super.* at 99–100. From all of this we may safely conclude that there was no substantial prejudice occasioned by plaintiff Turner's failure to have presented his claim within 90 days. And so we must examine the record to determine first whether the reasons given for late filing were sufficient to avoid the impact of the 90-day rule and whether the trial court erred in rejecting them; and, if so, whether in fact a claim was presented by someone acting "on behalf of" Turner within one year after accrual of his claim.

The serious nature of the injuries suffered by this plaintiff and the extent of his hospitalization have been recounted above, as has the fact of his confinement to his home until October 1974, after being released from the hospital. According to his affidavit in support of the second motion, Turner was "totally incapacitated" for longer than the 90 days period — certainly not a facially unlikely assertion, given the fact, as alleged, that he was extracted from the crushed cab of a vehicle which had exploded and burned,

and was in critical condition for about six weeks thereafter. The allegations here bear a striking resemblance to those in *Wade v. N. J. Turnpike Auth., supra,* involving as we have said the same occurrence. That case likewise presented for determination the propriety of a motion to permit late filing of a notice of claim under *N. J. S. A.* 59:8–9 and was decided by the same judge who sat in the instant matter. In granting the motion the trial judge first recognized that ignorance of the law (pleaded by plaintiff in *Wade* as it is here) standing alone does not excuse compliance with the statute's requirements. But he went on to emphasize that the plaintiff had offered additional reasons, including the following:

the five month confinement of Marle P. Wade, due to injuries received in the accident; his unawareness of any claim against public entities; the fact that shortly after the accident he was removed from a New Jersey hospital and flown to Maine where he remained until after April 28, 1974; and the late date at which New Jersey counsel was brought into the matter and apprised of the possible claims against public entities. Such reasons are certainly sufficient within the meaning of *N. J. S. A.* 59:8–9.

■ We quite agree that such reasons satisfy the requirements of the statute. Closely paralleling as they do the ones presented in this case to the same judge, we are constrained to find that in the present instance his discretion was mistakenly exercised in barring plaintiff Turner's claim on grounds of "sufficiency."

■ There remains only the issue of whether a claim was presented on Turner's behalf within one year of October 24, 1973. It is to be recalled that as of the time the motion was filed and indeed on the date it was first returnable, October 18, 1974, the chain linking Turner and his Maryland attorney to the New Jersey attorneys had not yet been completed. Turner's later affidavit in support of the second motion avers that prior to the expiration of the year he had instructed the Maryland attorney to ask Messrs. Lum, Biunno & Tompkins to "bring a personal injury action on

[his] behalf against all potential negligent parties." Mr. Drasco's affidavit does not bring the chain any closer to completion, but it substantiates Turner's assertion that the latter "undertook to communicate to retain" the New Jersey firm "just prior to one year after the accident." It was not until oral argument before this Court that the final link was provided, when Mr. Drasco flatly represented that the Maryland attorney had, after October 18, 1974 but prior to the expiration of one year from the occurrence of the accident, instructed the Lum firm to proceed on Turner's behalf. We accept that representation made to us in open court and by an officer of this Court, as did defendant's counsel at oral argument.

That being so, the result is that although technically the law firm may not have represented Turner at the time the motion to file a late notice of claim was initially brought and argued, that representation did come to fruition prior to the expiration of the critical one year period. And while it might be inappropriate to take issue with the trial judge had his original decision turned, to any extent, on the absence of a lawyer-client relationship[4], that was not the ground for his denial of the motion. Rather it was the insufficiency of the reasons presented.

Additionally we observe that while there may have been an absence of express authorization by Turner to either his employer or the law firm to pursue his personal injury claim, nevertheless neither Friel nor its attorneys can be considered, under the circumstances, officious intermeddlers in presuming to make the requisite motion on Turner's be-

---

[4]It seems obvious that some of the confusion surrounding plaintiff Turner's application might have been avoided had counsel promptly supplemented his moving papers to set forth the fact of the lawyer-client relationship prior to the expiration of the one year. This should have been done. However, the fact that we do not let that failure, in the context of this case, defeat plaintiff's claim does not mean we will not accord it great weight should that circumstance reappear in some other factual setting.

half. There was in each instance some relationship, albeit a tenuous one and in the law firm's case one short of attorney and client. For purposes of the decision in this case we need not, and therefore do not, hold that such imprecisely defined relationship was in itself a sufficient one to satisfy the "on behalf of" requirement of the statute at the time the motion was filed. We go no further than to recognize its significance in the congeries of facts before us, and to hold that on the facts of this case, particularly as reinforced at oral argument, the interests of justice compel the allowance of the application to file a late notice of claim as timely brought.

The point to which we have last adverted is important, as much for its negative implications as for its affirmative holding. It should not be interpreted as furnishing encouragement to the filing of late notices of claim by complete strangers to the claimant. It is not to be taken as indicative of any tolerance of "claim generating" or "claim production." Neither of these elements appears in any degree in the case before us.

IV

▮ Our Tort Claims Act is modeled on the California Tort Claims Act of 1963. See *Keller v. Somerset Cty.*, 137 *N. J. Super.* 1, 5 (App. Div. 1975). The courts of that state have examined more carefully cases in which permission to file a late claim has been denied than those in which it has been granted, "to the end that wherever possible cases may be heard on their merits, and any doubts which may exist should be resolved in favor of the application." *Viles v. Cal.*, 66 *Cal.* 2d 24, 56 *Cal. Rptr.* 666, 669, 423 *P.* 2d 818, 821 (Sup. Ct. 1967) ; see, *e. g., Thompson v. Fresno Cty.*, 59 *Cal.* 2d 686, 31 *Cal. Rptr.* 44, 381 *P.* 2d 924 (Sup. Ct. 1963). We adopt that approach as the proper one for consideration of applications to file claims under the New Jersey Tort Claims Act.

So much of the judgment below as bars the claims of plaintiff Friel is hereby affirmed.

So much of the judgment below as bars the claim of plaintiff Turner is hereby reversed and the cause remanded to the trial court.

*For affirmance in part and reversal and remandment in part*—Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER and Judge ·CONFORD—5.