731 A.2d 28

THOMAS A. EAGAN AND BERNADETTE T. EAGAN, HUSBAND AND WIFE, PLAINTIFFS–RESPONDENTS, v. ANDREW H. BO-YARSKY, M.D. AND JAMES MACKENZIE, M.D., DEFEN-DANTS–APPELLANTS, AND LISA BENTON, M.D., JOSEPH HEETHER, M.D. AND JOHN DOE, ESQUIRE I–III (A FICTI-TIOUS NAME DESIGNATING LEGAL COUNSEL), DEFEN-DANTS, AND BERNARD A. CAMPBELL, JR., ESQUIRE AND DESTRIBATS, CAMPBELL, DESANTIS & MAGEE, DEFEN-DANTS–RESPONDENTS.

Argued November 30, 1998—Decided June 7, 1999.

*Louis A. Ruprecht,* argued the cause for appellants (*Ruprecht, Hart & Weeks,* attorneys, *Mr. Ruprecht, Adele C. Baker* and *David F. Soltero,* on the brief).

*Robert J. Pollan,* argued the cause for respondents Thomas A. Eagan and Bernadette T. Eagan (*Haymond & Lundy,* attorneys).

*I. Blakeley Johnstone, III,* argued the cause for respondents Bernard A. Campbell, Jr., and Destribats, Campbell, DeStantis & Magee (*Johnstone, Skok, Loughlin & Lane,* attorneys, *John Bensulock,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The basic issue in this case, as in *Lowe v. Zarghami,* 158 *N.J.* 606, 731 *A.*2d 14 (1999), also decided today, is whether a clinical professor employed by the University of Medicine and Dentistry of New Jersey ("UMDNJ"), who practices medicine in a UMDNJ affiliated private hospital, is a public employee entitled to notice under the Tort Claims Act, *N.J.S.A.* 59:1–1 to 14–4 ("TCA"). We again conclude that UMDNJ faculty physicians practicing in affiliated private hospitals are public employees for the purposes of the Tort Claims Act.

I.

A. The Medical Malpractice Claim

Thomas Eagan was a member of HIP–Somerset, a health maintenance organization. In August, 1994, he visited his primary care physician from HIP complaining of a sore throat and fever. The doctor discovered a possible goiter. After some diagnostic testing, Eagan's physician referred him to Dr. Andrew H. Boyarsky and Dr. James Mackenzie. After examinations by both doctors in September, Eagan agreed to undergo a thyroidectomy and a mediastinoscopy. The surgeries were performed on October 25, 1994 at Robert Wood Johnson University Hospital. The doctors were assisted by two medical residents, Dr. Lisa Benton and Dr. Joseph Heether.

After the surgeries, Eagan was able to speak only in a whisper. He also complained of a sore throat. Dr. Boyarsky's report on the surgery documents an intraoperative injury in which Eagan's right recurrent laryngeal nerve "may have been severed." Eagan saw Dr. Boyarsky for two postoperative office visits. Both visits were conducted at the HIP treatment facility. During both visits, Eagan complained of hoarseness. Eagan was examined by two specialists and a neurologist in late November and early December 1994. All three doctors diagnosed Eagan as suffering from bilateral vocal cord paralysis. The doctors concluded that *both*

recurrent laryngeal nerves were severed during Eagan's surgeries.

B. Defendants' Employment with UMDNJ

Drs. Boyarsky and Mackenzie are clinical professors who are employed by UMDNJ, a public entity entitled to the protection of TCA. Each received a letter of appointment from UMDNJ. Those letters of appointment do not specify the terms and conditions of employment, but do incorporate the terms and conditions of the negotiated agreement between a union bargaining unit and UMDNJ. All full-time faculty members have a recognized bargaining agent in the American Association of University Professors, which negotiates on their behalf for benefits, holidays, merit pay procedures, grievances under the collective bargaining agreement and termination for cause procedures.

Defendants performed plaintiff's surgery at Robert Wood Johnson University Hospital ("RWJUH"). RWJUM had an affiliation agreement with UMDNJ similar to the one described in *Lowe*, *supra*, 158 *N.J.* at 611–13, 731 *A.*2d at 17–18. Although a private hospital, RWJUM is a teaching hospital for UMDNJ. Pursuant to the agreement, defendants became members of RWJUH's medical staff in accordance with that hospital's rules and regulations. The bylaws of the hospital and the medical staff as well as the policies set forth by RWJUH's Board of Directors govern the hospital's operation. UMDNJ is entitled to twenty-five percent representation on the governing board of RWJUH.

UMDNJ also controls RWJUH's Professional Affairs Committee that oversees "medical staff membership and privileges, quality assurance, medical staff by-laws and regulations, and the performance of medical staff in fulfilling its obligations to RWJUH." The Chief Administrative Officer of the hospital is an employee of the medical school. The respective Chiefs of Clinical Services at the hospital are chairs of the parallel departments at UMDNJ–Robert Wood Johnson Medical School (RWJMS). At the time of this suit, Dr. Boyarsky was the Chief of Surgery at

RWJUH and was also the Chairman of the Department of Surgery at the medical school.

Plaintiff was referred to defendants by his primary care physician from HIP. An affiliation agreement between UMDNJ–RWJMS and the Central New Jersey Medical Group allows HIP Health Plan of New Jersey to refer patients to UMDNJ–RWJMS doctors. Under an "Independent Contractor Agreement," UMDNJ–RWJMS agreed to provide services to HIP. Section 7.1 of the Agreement provides that UMDNJ–RWJMS physicians and other employees "shall ... be covered for professional and general liability by the UMDNJ Professional and General Liability Program of Self Insurance," and that "[s]aid coverage is governed by the terms and provisions of the State of New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 *et seq.*" Defendants do not carry malpractice insurance; they rely on UMDNJ's self-insurance.

Defendants' sole employment is with UMDNJ. Defendants receive their salary from UMDNJ, and all of the usual employer deductions and withholdings are taken from their pay. UMDNJ–RWJMS faculty are governed by a Medical Service and Research Plan, amended June 10, 1991. Under that plan, each member is required to "sign a contract governing the collection and distribution of income derived from professional services." The contract authorizes UMDNJ to bill and collect all fees from patient services and then redistribute the income from the Clinical Practice Account.

Under the overall salary structure at UMDNJ, UMDNJ retains ultimate control over the compensation received by its clinical professors. UMDNJ physicians are not allowed to issue their own bills; they must allow the University to bill patients. The physicians' salaries include state-funded compensation for teaching, plus a certain percentage derived from services to patients. However, the pay received by physicians is distributed from the patient billing fund only after a number of deductions that support UMDNJ programs, a discretionary fund, and benefits such as malpractice insurance. Although plaintiff emphasizes that partici-

pants in the faculty practice plan may set their own fees, all salaries of UMDNJ practicing physicians are subject to a salary cap. All physicians must also negotiate with the heads of their departments in order to receive a raise in salary, an increase in the percentage of the patient billing fund, or both. Despite some flexibility in salaries, UMDNJ maintains control over compensation.

Both UMDNJ and RWJUH furnish faculty physicians with equipment and resources for the delivery of medical services. The medical school provides offices and staff to its physicians through the faculty practice program, although some of these costs are offset by funds received through patient billing.

Dr. Boyarsky saw plaintiff at plaintiff's HIP primary care treatment center on numerous occasions both before and after the surgery. Dr. Mackenzie saw plaintiff at a RWJUH outpatient center. The University Medical Group, a faculty practice program established by UMDNJ–RWJMS to which both Dr. Boyarsky and Dr. Mackenzie belonged, issued bills for Eagan's surgery and other services. Plaintiff's medical insurance carrier, HIP, paid his bills. Plaintiff states in an affidavit, "At no time while I was under the care and treatment of Drs. Boyarsky and Mackenzie did I know that they were public employees or that they were anything other than private physicians to whom I was referred by my treating physicians from HIP."

C. Procedural History

Eagan contacted an attorney, Bernard A. Campbell, Esq, on April 10, 1995. Eagan signed a contingent fee agreement and hired Campbell's firm to represent him. On August 2, 1996, Eagan requested that Campbell transfer his file to new counsel. Current counsel received Eagan's file on August 7.

Eagan, with the assistance of new counsel, filed a malpractice action against Drs. Boyarsky, Mackenzie, Benton, and Heether on September 18, 1996. The doctors answered the complaint, alleging that they were public employees entitled to notice of a claim

under the Tort Claims Act. Eagan filed an amended complaint alleging legal malpractice against his former counsel.

The doctors filed a motion to dismiss for failure to provide notice. The trial court granted that motion on October 24, 1997. Three days later, the Appellate Division issued its opinion in *Lowe v. Zarghami*, 305 *N.J.Super.* 90, 701 *A*.2d 961 (1997). Eagan moved for reconsideration based on the *Lowe* court's conclusion that UMDNJ faculty practicing in private hospitals were independent contractors. The trial court reinstated the complaints against Dr. Boyarsky and Dr. Mackenzie, but not against the two medical residents.[1] The doctors then moved for reconsideration based on the consolidated appeals decided in *Allen v. Krause*, 306 *N.J.Super.* 448, 703 *A*.2d 993 (App.Div.1997). The court denied that motion, but stayed all discovery for 30 days, so the doctors could file an interlocutory appeal.

The doctors moved for leave to appeal. The Appellate Division denied that motion. The doctors then moved for leave to appeal to this Court, which we granted.

## II.

In *Lowe, supra,* 158 *N.J.* at 623–24, 731 *A*.2d at 23–24, the lead opinion on this issue, we determined that UMDNJ faculty practicing in affiliated private hospitals are public employees for the purposes of the Tort Claims Act. We reach that same conclusion in this case.

In *Lowe,* we discussed the two tests courts use to distinguish employees from independent contractors—the control test and the relative nature of the work test. *Id.* at 615–18, 731 *A*.2d at 19–20. We found that the relative nature of the work test supplements the control test in limited circumstances. *Id.* at 618, 731 *A*.2d at 21. If the working relationship involves professional services

---

[1] Relying on *Wajner v. Newark Beth Israel Medical Center,* 298 *N.J.Super.* 116, 689 *A*.2d 143 (App.Div.1997) which held that UMDNJ residents are public employees, the court did not reinstate the complaints against the two residents.

where an employer cannot exercise control over the methods used to provide those services, the relative nature of the work test may provide a more accurate assessment of the working relationship. *Dunellen v. F. Montecalvo Contracting*, 273 *N.J.Super.* 23, 28, 640 *A.*2d 1185 (App.Div.1994). Also, if a working relationship was created by social legislation under which public policy concerns dictate a more liberal standard, then a court may apply the relative nature of the work test rather than the control test. *Lowe, supra,* 158 *N.J.* at 618, 731 *A.*2d at 21.

"[A]s is the case with all professional employees, the governing body did not control the details" of how defendant physicians administered treatment. *Id.* at 618, 731 *A.*2d at 21 (quoting *Dunellen, supra,* 273 *N.J.Super.* at 28, 640 *A.*2d 1185). UMDNJ retained the right to terminate Drs. Boyarsky and Mackenzie and neither physician is employed outside of the University. All billing occurred through the University and the only salaries received by defendants were their UMDNJ paychecks, which were subject to numerous deductions as well as a salary cap. Defendants were totally economically dependent on UMDNJ and their work constituted an integral part of UMDNJ's business.

Furthermore, defendants' work related directly to the operation of UMDNJ. The faculty practice program has four main goals: to attract patients who will be treated by faculty and observed by students; to use the income from patient services to supplement faculty salaries; to establish UMDNJ faculties as a patient referral service; and to allow clinical teachers to retain and improve their medical skills. Attorney General Formal Opinion 23–1976. Defendants, as UMDNJ clinical professors, were required to participate in a faculty practice program and to treat patients while allowing students to observe and learn. As in *Lowe,* at least two medical residents were present during plaintiff's two surgeries. Defendants' treatment of plaintiff occurred while defendants were attempting to fulfill the goals of the faculty practice plan.

Because defendants were totally economically dependent on UMDNJ and because their work constituted an integral part of

UMDNJ's business, both aspects of the relative nature of the work test are satisfied. We, therefore, conclude that defendants are public employees of UMDNJ.

## III

 The trial court initially found that the defendants were public employees. It, therefore, granted their motion to dismiss for failure of plaintiff to provide notice under the TCA. When *Lowe, supra,* 305 *N.J.Super.* 90, 701 *A.*2d 961, decided that the clinical professors were independent contractors, the trial court reinstated the complaints against defendants. Because the trial court considered the issue of notice and the parties argued and briefed that issue, we now consider whether under the unique facts of this case, plaintiff may file a late notice of claim.

In *Lowe,* we held that the facts presented constituted extraordinary circumstances that required the court to grant Lowe's motion to file a late notice of a claim. *Id.* at 624–30, 731 *A.*2d at 24–27. We relied primarily on the legal doubt surrounding the employment status of UMDNJ faculty, Lowe's diligence in pursuing her claim, and her lack of awareness of her doctor's employment. *Id.* at 630–31, 731 *A.*2d at 27–28.

Eagan had even fewer reasons than Lowe to suspect that his doctors were UMDNJ professors or public employees. Defendants only were known to plaintiff through his HMO. He met with the doctors at his HMO's treatment facility. He was referred to Dr. Boyarsky and Mackenzie by his HMO primary care physician. The record indicates that Eagan had no information about the employment status of defendants.

However, unlike Lowe, Eagan did not file a notice of a late claim nor did he file a complaint within one year of the accrual of his claim. However, within six months of his operation, plaintiff had contacted his original attorney, who apparently took no action, and within the normal two-year period for medical malpractice cases had filed medical malpractice complaints against defendants. Eagan did not receive information indicating that Dr. Boyarsky

and Dr. Mackenzie were public employees until 17 months after the claim accrued. As a result, he undoubtedly believed that a late notice would be barred by the one-year time barrier of *N.J.S.A.* 59:8–9. Eagan nonetheless acted promptly to protect his rights, amending his complaint to include a malpractice claim against his initial counsel.

In *Lowe*, we relied on three cases to support the position that extraordinary circumstances could exist for the filing of a late notice of claim where the public entity, intentionally or unintentionally, obscured the identity of the appropriate responsible entity to be sued. *Lowe, supra*, 158 *N.J.* at 627–29, 731 A.2d at 25–27.

> In *Feinberg v. State, D.E.P.*, 137 *N.J.* 126 [644 A.2d 593] (1994), plaintiff sought more specific information about the ownership of the Delaware and Raritan Canal but was thwarted by the original defendants who failed to disclose the identity of the responsible public entity for two years beyond the accrual of the claim. *Id.* at 135 [644 A.2d 593].
>
> In *Zwirn v. County of Hudson*, 137 *N.J.Super.* 99 [347 A.2d 822] (Law Div.1975), plaintiff's counsel was misled unintentionally by county police officers about the ownership of the road where plaintiff's accident occurred. *Id.* at 101 [347 A.2d 822]. Finding that the belief of plaintiff's counsel was reasonable, though mistaken, because county police officers had advised him it was a county road and because the death involved an accident that was exhaustively investigated by the county police and county prosecutor, the court found that plaintiff had sufficient reasons to file a late notice of claim with the State. *Id.* at 104–05 [347 A.2d 822].
>
> In *Dambro v. Union Cty. Park Comm.*, 130 *N.J.Super.* 450 [327 A.2d 466] (Law Div.1974), the plaintiff's counsel sent a letter to the borough tax assessor describing the accident and requesting that he be informed about the owner of the property where plaintiff's accident occurred. *Id.* at 453 [327 A.2d 466]. The tax assessor wrote back indicating that the property was owned by the County Park Commission. *Ibid.* It was only after plaintiff was served with the Commission's third-party complaint that he learned that Watchung owned the premises either in whole or in part. *Ibid.* Watchung moved to dismiss, but the court held that plaintiff had substantially complied with *N.J.S.A.* 59:8–4 and 59:8–7 and that the borough was estopped from relying on the notice provision because the tax assessor had made a good faith mistake that misled the plaintiff's counsel concerning the borough's ownership. *Id.* at 457 [327 A.2d 466].
>
> [*Ibid.*]

In two of those cases, the court allowed the filing of a late notice of claim beyond one year of the accrual of the claims of the plaintiffs. In *Feinberg, supra*, 137 *N.J.* at 135, 644 A.2d 593, we

allowed the filing of a late notice of claim two years beyond the accrual of the plaintiff's claim. Although plaintiff did not file a formal notice of late claim within the one year of the accrual of his claim, we also allowed the late filing of a notice of claim in *Dambro, supra,* 130 *N.J.Super.* at 459, 327 *A.*2d 466.

We observed in *Lowe,*

> The notice provisions of the Tort Claims Act were not intended as "a trap for the unwary." *Murray v. Brown,* 259 *N.J.Super.* 360, 365, 613 *A.*2d 502 (Law Div.1991). "Generally, we examine 'more carefully cases in which permission to file a late claim has been denied than those in which it has been granted, to the end that wherever possible cases may be heard on their merits, and any doubts which may exist should be resolved in favor of the application.'" *Feinberg [v. State D.E.P.,* 137 *N.J.* 126, 135, 644 *A.*2d 593 (1994) ](quoting *S.E.W. Fried [Friel] Co. v. New Jersey Turnpike Auth.,* 73 *N.J.* 107, 122, 373 *A.*2d 364 (1977)); *Randazzo v. Township of Washington,* 286 *N.J.Super.* 215, 668 *A.*2d 1083 (App.Div.1995). Not any one particular factor constitutes "sufficient reasons" but courts consider a combination of factors. *Lamb v. Global Landfill Reclaiming,* 111 *N.J.* 134, 149, 543 *A.*2d 443 (1988). Likewise, not one scenario will constitute "extraordinary circumstances." Each case depends on its own circumstances. (citations omitted.)
>
> [*Lowe, supra,* 158 *N.J.* at 629, 731 *A.*2d at 27.]

Plaintiff sought prompt medical treatment. He contacted an attorney within six months of the accrual of his claim. There is no evidence supporting the conclusion that plaintiff knew defendants were UMDNJ employees. Indeed, plaintiff had no reason to suspect that his doctors were even associated with a public entity. He followed the procedures necessary to claim medical malpractice against a physician in ordinary circumstances. Like the plaintiffs in *Feinberg v. State D.E.P.,* 137 *N.J.* 126, 644 *A.*2d 593 (1994); *Zwirn v. County of Hudson,* 137 *N.J.Super.* 99, 347 *A.*2d 822 (Law Div.1975); and *Dambro v. Union Cty. Park Comm.,* 130 *N.J.Super.* 450, 327 *A.*2d 466 (Law Div.1974), he diligently pursued his claim. Like those plaintiffs he was thwarted in his action because the employment status of his doctors was obscured. We do not think that the Legislature contemplated that the one-year ban would be used to bar a plaintiff-patient from pursuing his medical malpractice claim against a physician whom he had no reason to believe was a public employee. In such unique circumstances, we find that the Legislature intended the one-year ban

provided under *N.J.S.A.* 59:8-9 to be tolled. Accordingly, plaintiff should be entitled to file a notice of late claim.

Moreover, a late notice of claim would not prejudice either the doctors or UMDNJ. Because the doctors are required to keep medical records in the ordinary course of treating patients, investigation of plaintiff's claim is not hindered by the delay in filing notice. Furthermore, the doctors must have been aware of the possibility of a malpractice suit, given plaintiff's repeated treatments and Dr. Boyarsky's report in which he documented that plaintiff's right recurrent laryngeal nerve "may have been severed."

As we stated in *Lowe, supra,* 158 *N.J.* at 631, 731 *A.*2d at 27, to make patients aware of their physician's employment status and to avoid this problem in the future, UMDNJ must require clinical professors employed by them to advise their patients, both orally and in writing, that they are employees of UMDNJ. Such notice should be given to a patient as soon as practicable. It also would be helpful if clinical professors wore badges identifying themselves as UMDNJ employees. Those steps, if taken together with this holding that clinical professors are UMDNJ employees, should make patients aware that their physicians are public employees entitled to notice under the TCA.

The judgment of the Law Division is reversed, and the case is remanded for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—6.

*Opposed*—none.