484 S.E.2d 475

**INTERSTATE DRILLING, INC., A West Virginia Corporation, Plaintiff Below, Appellant**

v.

**PARCOIL GATHERING SYSTEMS, INC., A Texas Corporation, Tarquin Energy Company, A Texas Corporation, Jack Charles Childers, d/b/a J.C. Jack Childers and Associates, and J.C. Childers and Associates, Inc., a West Virginia Corporation, Defendants Below, Appellees.**

No. 23749.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 29, 1997.

Decided Feb. 21, 1997.

James A. Varner, Harold M. Sklar, McNeer, Highland, McMunn & Varner, L.C. Clarksburg, WV, for Appellant.

Gregory A. Morgan, Young, Morgan & Cann, Clarksburg, WV, for Appellees.

PER CURIAM:

This action is before this Court upon the final order of the Circuit Court of Barbour County, West Virginia, entered on February 1, 1996. The appellant, Interstate Drilling, Inc., is a producer of natural gas, and the appellee, Parcoil Gathering Systems, Inc., is the owner of a pipeline through which such gas is transported to market. Interstate contends that it lost in excess of $36,000 worth of natural gas from June 1989 through August 1993 and further contends that the loss was caused by problems in Parcoil's pipeline. During the trial, however, the circuit court directed a verdict for Parcoil. This appeal followed.

This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. For the reasons stated below, this Court is of the opinion that the directed verdict constituted reversible error because the circuit court failed to adequately address Interstate's assertion of *res ipsa loquitur*. In addition, this Court is of the opinion that the circuit court committed reversible error in refusing to allow an amendment of the pleadings to reflect Interstate's theory of breach of contract. Accordingly, this action is remanded to the circuit court so that Interstate can pursue its claim against Parcoil. As explained below, however, we affirm the circuit court's rulings as to appellees Jack Charles Childers and J.C. Childers and Associates, Inc. Tarquin Energy Company was dismissed below and is no longer involved in this action.

I

Interstate operated two wells in Barbour County, known as the H. Marsh No. 1 and the H. Marsh No. 2 wells. In September 1984, Interstate's predecessor in title entered into a written Gathering Agreement with Parcoil for the transportation of natural gas from the wells, through the Parcoil pipeline, to a delivery point (Station 19) for marketing. Generally following State Route 38 in Barbour County, the Parcoil pipeline was several miles in length and was utilized by a number of natural gas producers in the area, in addition to Interstate. Parcoil's compensation for the transportation was based upon cubic feet of gas delivered to market.

In order to measure the amount of natural gas flowing through the Parcoil pipeline for marketing purposes, the producers and Parcoil employed an independent entity known as Gas Analytical Services, Inc. In particular, Gas Analytical Services was hired to allocate the proceeds from the sale of the natural gas among the individual producers on the Parcoil line. In making its calculations, Gas Analytical Services looked at both the well meters of the producers and a master meter located at Station 19. In that manner, the contribution of each producer to the aggregate quantity of natural gas delivered to market was determined.

However, as the record indicates, it was generally understood by the natural gas producers, including Interstate, that variances in the measure of gas flow would commonly occur between the well meters of the producers, where the transportation originated, and the master meter located at Station 19, where the transportation terminated for marketing. According to the Gathering Agreement, the producers, rather than Parcoil, were to bear the losses of natural gas reflected by the variances. As the brief of Parcoil states:

> [T]he Gathering Agreement is an agreement between the well owners (including Interstate) and Parcoil that any risk of loss due to imbalances between the aggregate volume of the well meters and the gas measured by the master meter would continue to be borne by the well owners and would not shift to Parcoil.

Thus, paragraph five of the Gathering Agreement provides:

> The volume of gas delivered by PGS [Parcoil] is determined by an allocation as calculated by Gas Analytical Services, Inc. The volume of gas for each individual well is further determined by an allocation as calculated by Gas Analytical Services, Inc. PGS shall have no liability for any variances in the allocations as determined by Gas Analytical Services, Inc. and the amounts measured at the well meter.

In June 1989, Interstate became suspicious that significant volumes of its natural gas were being lost in transit through the Parcoil pipeline. Despite Interstate's protests to Parcoil officials, however, the problem continued, and, as the circuit court found: "Losses [to Interstate] on the Parcoil pipeline averaged 27.50% in 1990, 18.26% in 1991, 14.76% in 1992 and 15.48% during the first eight months of 1993." In fact, the record reflects that in the month of December 1990, the rate of loss of gas owned by Interstate was approximately 50%. Those losses, as found by the circuit court, were based upon measurements conducted by Gas Analytical Services. Although Parcoil attempted to correct the problem by taking actions such as replacing portions of the pipeline, its efforts proved unsuccessful.

## II

In May 1991, Interstate filed a complaint alleging that the pipeline was under the "exclusive custody and control" of Parcoil and that, because of Parcoil's negligence in operating and maintaining the pipeline, Interstate suffered economic damages from losses of natural gas. The complaint did not allege a theory of recovery based upon breach of contract. In its answer, Parcoil asserted, *inter alia*, as follows: "The agreement between the parties relating to the transportation of natural gas ... contains the following exculpatory provision, Parcoil shall have no liability for any variances in the allocations as determined by Gas Analytical Services, Inc. and the amounts (of gas) measured at the well meter." Thereafter, Interstate filed an amended complaint which added Jack Charles Childers and J.C. Childers and Associates, Inc. as defendants to the action. Interstate's theory of recovery based upon negligence, however, remained the same. Repeated in the joint answer of Parcoil and Childers to the amended complaint was the above-quoted portion of the original answer, referring to the Gathering Agreement.

During the course of the litigation, Parcoil, pursuant to an option available to both contracting parties, terminated the Gathering Agreement. Interstate then built its own pipeline to the market at Station 19 at a cost of approximately $11,000. As recognized by the circuit court, Interstate's losses of natural gas were significantly diminished upon its use of the new line.

On August 11, 1994, a bench trial was conducted by the circuit court. Interstate called three witnesses: Kenneth L. Pote, Vice President of Interstate, George S. Sly, President of Gas Analytical Services, and Edward J. Massey, President of Parcoil. The above factual circumstances were set forth by those witnesses. At the close of Interstate's evidence, however, the circuit court directed a verdict for all defendants. Concluding that Interstate had failed to establish facts in support of its theory of negligence, the circuit court explained:

> [T]he Court is clearly of the opinion that the line has huge losses. Were I an investor, I wouldn't want to be on that line....

> But the Court is not convinced that there has been any proof as to where the loss is going. Whether it's the result of line leakage or a multitude of other reasons, and I haven't seen one indication of a specific act of negligence on the part of the defendants which has caused the loss.

Thereafter, Interstate moved for an amendment of the pleadings, pursuant to Rule 15(b) of the *West Virginia Rules of Civil Procedure*, to reflect Interstate's additional theory of breach of contract. Observing, however, that neither the complaint nor the amended complaint alleged breach of contract, the circuit court denied the motion. The rulings of the circuit court concerning the directed verdict and the Rule 15(b) motion were entered on February 1, 1996.

## III

As indicated above, a bench trial was conducted in this action during which the circuit court made findings concerning Interstate's losses of natural gas but concluded that Interstate had failed to prove negligence. In reviewing the rulings of the circuit court, this Court notes our recent opinion in *Public Citizen, Inc. v. First National Bank*, 198 W. Va. 329, 480 S.E.2d 538 (1996), syllabus point 1 of which states:

> In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Here, however, the scope of this Court's review is narrowed by the fact that this appeal arose from the granting of a directed verdict at mid-trial. *See W. Va. R. Civ. P.* 50. Consequently, we look, more specifically, to syllabus point 3 of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996), which holds:

> The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia

Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to nonmovant party, will sustain the granting of directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed.

Interstate contends that the circuit court committed reversible error because it failed to adequately address Interstate's assertion of *res ipsa loquitur* at trial. In addition, Interstate contends that the circuit court committed reversible error in refusing to allow an amendment of the pleadings to reflect Interstate's theory of breach of contract. Parcoil, on the other hand, contends that *res ipsa loquitur* does not apply to this action because (1) Parcoil made reasonable efforts to maintain the integrity of its pipeline and (2) the Gathering Agreement contemplated that losses of natural gas would commonly occur, as reflected by variances in the measure of gas flow. According to Parcoil, the losses of natural gas could have been the result of a number of factors, including humidity or cold weather. Moreover, Parcoil contends that breach of contract was not sufficiently interjected into the trial to justify an amendment of the pleadings.

■ In *Royal Furniture Co. v. City of Morgantown,* 164 W.Va. 400, 263 S.E.2d 878 (1980), this Court set forth an *a priori* standard concerning the doctrine of *res ipsa loquitur.* Syllabus point 2 thereof states:

> Before the doctrine of *res ipsa loquitur* is applicable, three essentials must exist: (1) the instrumentality which causes the injury must be under the exclusive control and management of the defendant; (2) the plaintiff must be without fault; and (3) the injury must be such that in the ordinary course of events it would not have happened had the one in control of the instrumentality used due care.

*See also* syl. pt. 4, *Cunningham v. West Virginia–American Water Co.,* 193 W.Va. 450, 457 S.E.2d 127 (1995); syl. pt. 1, *Baxter v. Cramco, Inc.,* 188 W.Va. 515, 425 S.E.2d 191 (1992); 13B M.J. *Negligence* § 55 (1988); 57B Am.Jur.2d *Negligence* § 1819, *et seq.* (1989); 65A C.J.S. *Negligence* § 220.2 (1966).

In *Royal Furniture,* two retail business owners brought an action against the City of Morgantown claiming that the City, as the operator of a water distribution system, had negligently allowed water to escape from one of its water lines and run into the business owners' premises, causing damages. In affirming judgments for the business owners, this Court held that *res ipsa loquitur* was applicable. As this Court stated:

> Unquestionably, the water pipes, which caused the damage were installed by and remained the property of the defendant city. It is undisputed that they were under the exclusive control of the city at the time of the damage to the plaintiffs' property. Although the defendant sought to explain the reason for the bursted pipes, the explanation consisted of mere speculation of what may have happened to cause the rupture and subsequent damages. This explanation was inadequate and did not excuse the defendant from blame.

164 W.Va. at 404–05, 263 S.E.2d at 881.

Similarly, in *Mecum v. Food Machinery & Chemical Corp.,* 143 W.Va. 627, 103 S.E.2d 897 (1958), this Court held that *res ipsa loquitur* was properly applied, where the plaintiffs' automobiles were damaged by the escape of a corrosive substance from the defendant's manufacturing unit. In *Mecum,* the record indicated that (1) the manufacturing unit was under the exclusive control of the defendant, (2) the plaintiffs were not at fault and (3) the escape of the corrosive substance was not an ordinary occurrence. 143 W.Va. at 638, 103 S.E.2d at 905.

■ In this action, *res ipsa loquitur,* as part of Interstate's negligence theory, was expressly raised at trial. As counsel for Interstate stated to the circuit court: "[W]hen Interstate Drilling goes off it is able to immediately reduce to an average below 50% of its line losses. And I think that was indicative of at least a *res ipsa* case, if not active negligence.... [Parcoil] had been repairing line—that there were problems that were acknowledged [.]" The circuit court,

however, although indicating that "huge losses" of natural gas from the Parcoil pipeline had occurred, never specifically addressed *res ipsa loquitur.* Rather, the circuit court stated that no specific acts of negligence had been established.

Under the principles of *Brannon, supra,* this Court, in the context of the directed verdict for Parcoil, must consider the evidence in the light most favorable to Interstate. That evidence reveals that, during the period in question, significant volumes of natural gas owned by Interstate were lost in transit through a pipeline under the exclusive control and management of Parcoil. Moreover, Interstate was without fault. In addition, the fact that Interstate's losses of natural gas significantly diminished upon the building of its own pipeline indicates that the losses resulting from the Parcoil pipeline, Parcoil's corrective efforts notwithstanding, would not have occurred to the extent they did had Parcoil exercised due care. Upon the latter point, Parcoil's assertion that losses of gas could have been the result of a number of factors, including humidity or cold weather, is rather speculative in view of the large quantity of gas lost. *See Royal Furniture, supra.*

Accordingly, this Court is of the opinion that the circuit court failed to adequately address Interstate's assertion of *res ipsa loquitur.* The directed verdict for Parcoil thus constituted reversible error.

■ With regard to the circuit court's refusal to allow an amendment of the pleadings to reflect Interstate's theory of breach of contract, it should be noted that, not only was the Gathering Agreement admitted into evidence at trial, its terms were relied upon by Parcoil in its defense. In particular, Parcoil asserted in its answer, and at trial, that the Gathering Agreement contemplated that losses of natural gas would commonly occur, as reflected by variances in the measure of gas flow, and that such losses were to be borne by the producers, such as Interstate. As counsel for Parcoil argued during the trial:

[W]e're going to have Gas Analytical do an allocation, and the only gas that really gets sold—what we're going to get money for—

is what goes into Station 19.... But what we're going to do is we're going to basically share the risk of any loss or any imbalance. So, the fact that ... the gas produced at these well heads didn't match what was down here—that's simply part of the deal. That's the deal they signed.

Rule 15(b) of the *West Virginia Rules of Civil Procedure* provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

A review of the record herein demonstrates that the controversy underlying this litigation is difficult to resolve without considering the Gathering Agreement. Specifically, it is difficult to determine whether Interstate suffered losses without considering the allowances for variances in gas flow under the Agreement. According to Interstate, the losses determined by the circuit court, i.e., 27.50% in 1990, 18.26% in 1991, 14.76% in 1992 and 15.48% during the first eight months of 1993, were in excess of the variances or losses contemplated under the Agreement. In any event, there is a redundancy in the evidence as between Interstate's negligence and breach of contract theories, such that any prejudice to Parcoil from an amendment of the pleadings would have been negligible.

 In syllabus point 1 of *Adkins v. Slater,* 171 W.Va. 203, 298 S.E.2d 236 (1982), this Court observed:

> '[M]otions to amend should always be granted under Rule 15 when: (1) the amendment permits the presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue.' Syl. pt. 3, *Rosier v. Garron, Inc.,* 156 W.Va. 861, 199 S.E.2d 50 (1973), *in part.*

Moreover, as stated in 3 *Moore's Federal Practice* 15.13[2] (Matthew Bender & Co.1996):

> Rule 15(b) has rejected any concept that such amendments are barred if they result in a change of the plaintiff's 'cause of action [.]' ... The fact that this involves a change in the nature of the cause of action, or the legal theory of the action, is immaterial so long as the opposing party has not been prejudiced in presenting his case.

Therefore, under the circumstances of this action, this Court is of the opinion that the circuit court committed reversible error in refusing to allow the amendment of the pleadings to reflect Interstate's theory of breach of contract.

 Finally, we note that the February 1, 1996, rulings of the circuit court also resulted in a judgment in favor of Jack Charles Childers and his company, J.C. Childers and Associates, Inc. Mr. Childers, a former employee of Parcoil, was hired by Parcoil to assist in repairing the Parcoil line during the period in question. He and his company were never parties to the Gathering Agreement. A review of the record reveals that, although Jack Charles Childers and J.C. Childers and Associates, Inc. were named as defendants in this action, references to them by both Interstate and Parcoil, at trial and before this Court, have been rather tangential. The focus of Interstate throughout this litigation has clearly been upon Parcoil. Accordingly, this Court will not disturb the rulings of the circuit court as to Jack Charles Childers and J.C. Childers and Associates, Inc.

Upon all of the above, therefore, the final order of the Circuit Court of Barbour County, entered on February 1, 1996, is affirmed as to Jack Charles Childers and J.C. Childers and Associates, Inc. However, as to Parcoil Gathering Systems, Inc., the final order is reversed, and this action is remanded to the circuit court for a new trial.

Affirmed, in part; Reversed, in part, and remanded.