501 S.E.2d 165

Charles D. FOSTER and Dolly D. Foster, Tammy Martin, Theodore Metcalfe, and James Yeckel and Shelda Yeckel, Plaintiffs below, Respondents,

v.

CITY OF KEYSER, a West Virginia municipality; Norman Parks, individually, and d/b/a Parks Excavating; and Parks Excavating, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

Donald L. WOLFE and Virginia Wolfe, Plaintiffs below, Respondents,

v.

MOUNTAINEER GAS COMPANY, a West Virginia corporation, Defendant below, Petitioner;

and

Norman Parks, individually, and d/b/a Parks Excavating, Defendant below, Respondent,

v.

CITY OF KEYSER, a West Virginia municipality, Third–Party Defendant below, Respondent.

R.J. HARBER and M.S. Harber; Charles Taylor and Melanie Taylor; Daniel Streets and Paula Streets; Timothy Newlin and Virginia Newlin; Steve Everett and Cynthia Everett; Junior Armentrout and June Halbritter; Dorothy Lyons; William Paitsel; Harry Beard; and Tammy Martin, Plaintiffs below, Respondents,

v.

CITY OF KEYSER, a West Virginia municipality; Norman Parks, individually, and d/b/a Parks Excavating; and Parks Excavating, a West Virginia corporation, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

NATIONWIDE MUTUAL INSURANCE COMPANY, Plaintiff below, Respondent,

v.

CITY OF KEYSER, a municipal corporation; and Norman Parks, an individual doing business as Parks Excavating, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

Tammy MARTIN, Administrator of the Estate of David G. Martin, deceased; John B. Lusk and Sue E. Lusk; Samuel L. Crites and Carol A. Crites; and J. Richard Campbell and Margaret H. Campbell, Plaintiffs below, Respondents,

v.

CITY OF KEYSER, a West Virginia municipality; Norman Parks, individually and d/b/a Parks Excavating; and Parks Excavating, a West Virginia corporation, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

Charles B. LANHAM and a West Virginia corporation, and City of Keyser, a municipal corporation, Plaintiffs below, Respondents,

v.

MOUNTAINEER GAS COMPANY, a West Virginia corporation, Defendant and Third–Party Plaintiff below, Petitioner;

and

City of Keyser, a municipal corporation, Defendant and Third–Party Plaintiff below, Respondent,

v.

Norman PARKS, individually and d/b/a Parks Excavating, a West Virginia corporation, Third–Party Defendant below, Respondent.

**2**

Charles ARMENTROUT and Peggy Armentrout, husband and wife, and Daniel Ross and Sandy Ross, husband and wife, Plaintiffs below, Respondents,

v.

CITY OF KEYSER, a West Virginia municipality; Norman Parks, individually, and d/b/a Parks Excavating; and Parks Excavating, a West Virginia corporation, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

Dorothy JOHNSON; Robert T. Kane, Jr. and Cheryl L. Kane, his wife, and William Amtower, Plaintiffs below, Respondents,

v.

CITY OF KEYSER, a West Virginia municipality; Norman Parks, individually, and d/b/a Parks Excavating, Defendants below, Respondents;

and

Mountaineer Gas Company, a West Virginia corporation, Defendant below, Petitioner.

No. 24001.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 15, 1997.

Decided Dec. 15, 1997.

Robert W. Trumble, Michael J. Novotny, McNeer, Highland, McMunn & Varner, Martinsburg, for Respondents Charles D. Foster and Dolly D. Foster, et al.

Daniel C. Cooper, Steptoe & Johnson, Clarksburg, for Respondent City of Keyser, et al.

Frank X. Duff, James P. Mazzone, Robert G. McCoid, Schrader, Byrd, Companion & Gurley, Wheeling, for Petitioner Mountaineer Gas Company.

Oscar M. Bean, Bean & Bean, Moorefield, for Respondents R.J. Harber and M.S. Harber, et al.

David P. Cookman, Romney, for Respondents Tammy Martin, Administrator of the Estate of David G. Martin, et al.

Timothy M. Sirk, Keyser, for Respondent Charles B. Lanham, a West Virginia corporation, et al.

William E. Mohler, III, James A. Jarrell, Kenneth E. Tawney, Columbia Gas Transmission Corporation, Charleston, for Amicus Curiae, Columbia Gas Transmission Corporation.

Avrum Levicoff, Tracey A. Jordan, Brown & Levicoff, Pittsburgh, Pennsylvania for Respondent Norman Parks, individually, and dba Parks Excavating.

Stephen L. Gaylock, Charleston, for Respondent Nationwide Mutual Insurance Company.

Homer Speaker, Burke Street Law Center, Martinsburg, for Respondents Charles Armentrout, et al.

Brian L. Mims, El Paso Energy Corporation, Houston, Texas and Bader C. Giggenbach, William C. Brewer & Associates, Morgantown, for Amicus Curiae, Tennessee Gas Pipeline Company.

Evan H. Jenkins, West Virginia Chamber of Commerce, Charleston, for Amicus Curiae, West Virginia Chamber of Commerce.

H.L. Snyder, Timothy M. Miller, Robinson & McElwee, Charleston, for Amicus Curiae, West Virginia Oil & Natural Gas Association.

STARCHER, Justice:

This case arose out of a natural gas explosion in Keyser, West Virginia. Gas apparently leaked from an underground gas transmission line that runs along Beacon Street, and flowed through a sewer line into a house, where the gas ignited and exploded. The circuit court concluded, based on language in one of our cases, that the gas company which operated the transmission line was liable for the damages caused by the explosion, regardless of whether the company was at fault in the causation of the leak. We conclude that the circuit court (understandably) misapplied the language of the case in question. We note that a gas company has an extremely high standard of care with respect to its transmission lines, and the gas company may well have been at fault in the instant case, but we do not think that ordinarily imposing "strict liability" on transmitters of natural gas is necessary to achieve justice. We reverse the circuit court's order on this issue.

The circuit court also erred, we find, in ordering that all of the claims against the City of Keyser, which had employed a contractor to do excavation work in the area of the gas transmission line, were entirely barred by our statutes, because the parties claiming injury from the explosion had been compensated to a degree for their damages by their insurance. We determine that our statutes do not create such a bar, but we do hold that any recovery by the plaintiffs from Keyser is subject to an offset in the amount of first-party insurance proceeds that a plaintiff has received. We consequently reverse this order of the circuit court as well. We remand the case for further proceedings.

## I.

### *Facts and Background*

This appeal challenges two orders entered by the Circuit Court of Mineral County in several (consolidated) civil actions which arose out of a September 27, 1993 natural gas explosion in a residence just outside the city limits of Keyser, West Virginia.

In the consolidated cases, the plaintiffs, alleging personal and/or property damages as a result of the explosion, sued: (1) Mountaineer Gas Company ("Mountaineer"), which provided natural gas service to the residence from a buried natural gas transmission line [1]

---

1. A review of many cases dealing with natural gas discloses that natural gas is commonly transmitted to and from its producers, storers, distributors and users under pressure through a network of pipes that are often buried underground. This network of pipes is connected in various ways and interspersed with valves, regulators, meters, reducers, fittings, and other devices. On the distribution end, the network of transmission pipes ordinarily delivers gas to appliances, fixtures or other devices and instrumentalities that utilize the gas. Many terms are used to refer to this network and its components. The term "line" is commonly used to refer to pipes, as in "gas distribution line," "or gas transmission line." Primary pipes in this system are sometimes referred to as "pipelines" or "mains;" pipes that go from the main distribution pipes to individual users are sometimes called "service" pipes or lines. "Plumbing" is another term that may be used for the components of the system inside a building where the gas is used; "appliance" is a common term for gas-using devices. *See generally,* 27A Am.Jur.2d Energy and Power

running along the public street on which the residence is located; (2) the City of Keyser ("Keyser"), which provides sewage service to the residence through a buried sewer pipe that runs along the same street and near the gas transmission line; and (3) Parks Excavating Company ("Parks"), which was employed by Keyser to do excavation and repair of Keyser's sewer line in the area of the residence.

The plaintiffs in the consolidated civil actions claim that the defendants are jointly and severally liable for the plaintiffs' damages. All of the defendants have filed cross-claims against each other, seeking indemnity and contribution.

How did the explosion occur? From the limited record before us, it appears (we note that our factual discussion is not determinative in subsequent proceedings in this case) that about six weeks before the explosion, Parks, while working on the sewer line, uncovered and then backfilled around Mountaineer's gas transmission line. Parks contends that he requested from Mountaineer constant

surveillance of his work during the portion of the excavation when the gas transmission line would be uncovered or exposed. Parks also claims that Mountaineer refused the request for help and explained that Mountaineer was short-staffed and could not spare the manpower to survey the project. Mountaineer apparently did perform some inspection of the excavation.

A West Virginia Public Service Commission ("PSC") investigation of the explosion concluded that movement and strain on the gas transmission line from Parks' excavation activities contributed to the failure of a compression coupling joining two sections of the gas line, which in turn led to the line's separation. Gas under pressure then apparently flowed through a nearby sewer line into the residence, after which the gas was ignited in an unknown fashion.

The PSC report recommended that, in light of the explosion, Mountaineer should revise its operating procedures regarding the inspection of gas transmission lines that could be damaged by excavation activities.[2]

Sources, Secs. 368–376, "Liability for Injury or Damage from Gas." In this opinion, we will generally use the generic term "gas transmission line" to refer to this entire network of pipes and its various components and sections, with specific portions of the network noted as necessary.

2. The PSC report stated that Mountaineer's "Operating & Maintenance Procedures" should be revised to:

... include instructions for employees to provide for the inspection of pipelines that could be damaged by excavation activities pursuant to the requirements of 49 CFR Part 192.614(b)(6)(i) and (ii) ... [and] develop appropriate forms to be utilized by the employee when conducting inspections pursuant to 49 CFR 192.614(b)(6)(i) and (ii), and incorporate the form in the Operating & Maintenance Procedures.

49 CFR 192.614 [1996] states, in part:

(a) Except for pipelines listed in paragraph (c) of this section, each operator of a buried pipeline shall carry out in accordance with this section a written program to prevent damage to that pipeline by excavation activities. For the purpose of this section, "excavation activities" include excavation, blasting, boring, tunneling, backfilling, the removal of aboveground structures by either explosive or mechanical means, and other earth moving operations. An operator may perform any of the duties required by paragraph (b) of this section through participation in a public service program, such as a "one-call" system,

but such participation does not relieve the operator of responsibility for compliance with this section.

(b) The damage prevention program required by paragraph (a) of this section must, at a minimum:

(1) Include the identity, on a current basis, of persons who normally engage in excavation activities in the area in which the pipeline is located.

(2) Provide for general notification of the public in the vicinity of the pipeline and actual notification of the persons identified in paragraph (b)(1) of the following as often as needed to make them aware of the damage prevention program:

(i) The program's existence and purpose; and

(ii) How to learn the location of underground pipelines before excavation activities are begun.

(3) Provide a means of receiving and recording notification of planned excavation activities.

(4) If the operator has buried pipelines in the area of excavation activity, provide for actual notification of persons who give notice of their intent to excavate of the type of temporary marking to be provided and how to identify the markings.

(5) Provide for temporary marking of buried pipelines in the area of excavation activity before, as far as practical, the activity begins.

(6) Provide as follows for inspection of pipelines that an operator has reason to believe could be damaged by excavation activities:

Following a variety of motions and rulings that are not pertinent to the instant appeal, on August 5, 1996, the circuit court granted partial summary judgment as to liability for all plaintiffs against Mountaineer, under a theory of strict liability, relying upon language in this Court's opinion in the case of *Everly v. Columbia Gas of W. Va., Inc.*, 171 W.Va. 534, 301 S.E.2d 165 (1982).[3]

In explaining his ruling, the circuit judge said that "there is *strict liability* . . . [under] *Everly* . . . it's their [Mountaineer's] problem . . . it's their product. If someone else

> (i) The inspection must be done as frequently as necessary during and after the activities to verify the integrity of the pipeline; and
> (ii) In the case of blasting, any inspection must include leakage surveys.
> We express no opinion as to the legal significance, if any, of the PSC findings or the PSC recommendation.

3. The pertinent portions of the summary judgment order stated:

ORDER
*Findings of Fact*
1. On September 27, 1993, at approximately 12:40 p.m., an explosion and fire occurred at the residence of Ms. Tammy Martin at 1505 Beacon Street, Keyser, Mineral County, West Virginia.
2. The cause of the explosion was the accumulation of natural gas in the residence.
3. The natural gas accumulated in said residence by underground migration from a leak in a two-inch plastic distribution line owned and operated by Mountaineer Gas Company that paralleled Beacon Street and provided the source of natural gas service to the structure involved as well as other residences in the general area.
4. Visual examination of the gas distribution pipeline where the leak occurred disclosed that a two-inch steel compression coupling failed resulting in the separation of the distribution line allowing natural gas to flow into the surrounding soil.
*Conclusions of Law*
The law in the State of West Virginia in regard to the facts stated above is controlled by *Everly v. Columbia Gas of West Virginia, Inc.*, [171 W.Va. 534] 301 S.E.2d 165 (W.Va.1982) which states [301 S.E.2d] at page 168:
> As to parts of the system not controlled by plaintiffs, their burden is only to prove that gas escaped from the gas company's appliance or distribution line, and there resulted an explosion. They need not prove the negligent act that caused the escape.
This Court finds that there is no genuine issue of material fact that gas escaped from a natural gas distribution line owned and operated by Mountaineer Gas Company, that the place along the gas line where the leak occurred was not under the control of any of the plaintiffs and the ·

caused their product to escape, you · know they can go one, two, three [and proceed with indemnity and contribution claims against the other defendants]." (emphasis added).

On August 22, 1996, the circuit court also granted summary judgment on behalf of Keyser, finding that all claims against Keyser were at least in part "subrogation claims" and therefore barred by *W.Va.Code*, 29–12A–13(c) [1986], a portion of our Governmental Tort Claims and Insurance Reform Act, *W.Va.Code*, 29–12A–1 to –18.[4]

> leaking gas resulted in an explosion causing property damages and/or bodily injury to the plaintiffs herein.
> Based upon the said finding of fact and conclusions of law, this Court finds that the defendant, Mountaineer Gas Company is liable to the plaintiffs for all injuries determined to be a proximate result of the September 27, 1993 explosion.

4. The pertinent portions of the summary judgment order state as follows:

> . . . The Court notes that all of the plaintiffs in these cases claim to have suffered losses as a result of a natural gas explosion that occurred on September 27, 1993. Each plaintiff in this case has been compensated or partially compensated for his or her loss from insurance or workers' compensation.
> On two previous occasions in this case, the Court has applied the Governmental Tort Claims and Insurance Reform Act, W.Va.Code § 29–12A–1 through § 29–12A–18 (the "Act") to dismiss claims by certain plaintiffs against Keyser. In Civil Action No. 95–C–87, the Court dismissed the pure subrogation claim of Nationwide Insurance Company in accordance with the mandate of § 29–12A–13 which prohibits subrogation claims against the City. In Civil Action No. 95–C–91, the Court granted Keyser summary judgment with regard to the claims of Mr. and Mrs. Armentrout and Mr. and Mrs. Ross pursuant to the mandate of § 29–12A–5(a)(11) which prohibits claims against the City where workers' compensation has partially compensated the plaintiffs. The Court rendered this holding based on the law as stated in *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992). In each of these cases the Court granted summary judgment with regard to any related cross-claims, because to rule otherwise would defeat the protective purpose of the Act.
> In *Randall v. Fairmont City Police Dept.*, 186 W.Va. 336, 412 S.E.2d 737 (1991) the West Virginia Supreme Court of Appeals noted that the purpose of the Governmental Tort Claims and Insurance Reform Act is to help local governmental entities to be able to afford liability insurance and, at the same time, to be able to afford to provide other services that citizens depend on

Mountaineer subsequently filed the instant appeal, asserting that the circuit court's two summary judgment rulings regarding Mountaineer and Keyser were erroneous.

## II.

### Discussion

### A.

### Standard of Review

"A circuit court's entry of summary judgment is reviewed de novo." Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

### B.

### Strict Liability

### 1.

### The Everly Case

The circuit court read *Everly v. Columbia Gas of W.Va., Inc.*, 171 W.Va. 534, 301 S.E.2d 165 (1982) as having created a rule of strict liability for transmitters of natural gas. We can understand the circuit court's conclusion, because there is language in *Everly* which, taken alone, suggests that in some circumstances a transmitter of natural gas may be held strictly liable for damages from an explosion caused by leaking gas from gas transmission lines.

However, a careful reading of the language in question from *Everly* shows that this Court was not discussing strict liability in *Everly*. Rather, we were discussing what a party would need to show to establish *prima facie negligence* against a gas company for injuries caused by an explosion of gas that leaked from gas transmission lines.

In *Everly*, a homeowner and a boarder sued a gas company following an explosion of gas that leaked from a gas transmission line and damaged a residential building. Because we concluded that the circuit court erroneously gave a "contributory negligence" instruction and a "sole proximate cause" instruction, we reversed a verdict for the defendant gas company, and we remanded the case for a new trial.

government to provide. The *Randall* Court noted the fact that the application of the Act may, in some instances, work a hardship on persons injured by political subdivisions. *Id.* at 343, 412 S.E.2d 737.

In *O'Dell*, the West Virginia Supreme Court of Appeals addressed the question of a political subdivision's immunity from civil actions where a plaintiff had been partially compensated for his/her loss by workers' compensation. In *O'Dell* the plaintiffs argued that the word "claim" as used in the Act referred only to that portion of their claim that was actually compensated by workers' compensation. The Court rejected this argument and held that "claim" provided immunity for the plaintiff's entire claim even though a plaintiff may not be fully compensated for all damages. Based on the stated purpose of the Act and applying a plain meaning to the word "claim," the Court held that one who is partially compensated by workers' compensation cannot recover further damages against a political subdivision.

Applying the *O'Dell* logic to the case at bar, and remaining consistent with this Court's prior rulings in this case, this Court is of the opinion that the City of Keyser's Motion for Summary Judgment should be GRANTED in its entirety. The Court finds that each plaintiff with a claim remaining against Keyser has been partially compensated by insurance. The Court is mindful that some of the remaining plaintiffs are making claims that exceed the amount that they were paid by their insurance or for damages that are derivative of their insurance claim but for which no compensation was provided by their insurance agreement. However, a large number of the remaining claimants seek no more than the amount of the deductible on their insurance policy. Some plaintiffs seek to recover nothing and are only participating in this civil action pursuant to their contractual obligation to cooperate with their insurer's attempt to exercise its right of subrogation.

W.Va.Code, § 29–12A–13(c) states, "all actions filed against a political subdivision shall be filed in the name of the real party or parties in interest, and *in no event may any claim be presented or recovery be had under a right of subrogation.*" (emphasis added). This Court finds that to be consistent with the stated purpose of the Act and the holding of *O'Dell* the term "any claim" as used in this provision of the Act must be interpreted to include the entire amount of any claim brought under a right of subrogation. Therefore, it is hereby *ORDERED* that the City of Keyser's Motion for Summary Judgment as to all remaining claims by all plaintiffs in this civil action is GRANTED. Therefore, all remaining claims in this consolidated civil action are DISMISSED WITH PREJUDICE as to the City of Keyser only. Consistent with the prior rulings of this Court and the stated purpose of the Act, this ruling also applies to all related cross-claims or third-party claims against the City of Keyser by whomever brought, and each such cross-claim or third-party claim is, likewise, DISMISSED WITH PREJUDICE.

However, we *upheld* the giving of an instruction which told the jury that the plaintiffs, in order to prove a *prima facie* case of negligence against the gas company, were required to prove some negligent act or omission by the gas company—if the jury found that the explosion was caused by a leak in a gas transmission line *inside* the plaintiff's building, and if the gas company did not have any responsibility for such portion of the gas transmission line.

We further stated—and this is where the potentially confusing language in *Everly* occurs—that in order to prove a *prima facie* case of negligence against the gas company, the plaintiffs were *not* required to prove a specific negligent act or omission by the gas company "as to parts of the system not controlled by plaintiffs[.]" 171 W.Va. at 537, 301 S.E.2d at 168.

That is, we stated in *Everly* that if the jury found that the gas leak came from a portion of the gas transmission line for which the plaintiff did not have responsibility, and for which the gas company therefore did have responsibility, the plaintiffs' "burden is only to prove that gas escaped from the gas company's appliance or distribution line, and there resulted an explosion. They need not prove the negligent act that caused the escape." *Id.*

This is the language in *Everly* which the circuit court in the instant case held created strict liability by Mountaineer for all damages caused by an explosion of gas which leaked from Mountaineer's gas transmission line. (The circuit court in the instant case found in granting summary judgment that the plaintiffs had no responsibility for the portion of the gas transmission line that leaked and led to the explosion at issue in the instant case.)

However, as the foregoing examination of *Everly* shows, the language relied upon by the circuit court in granting summary judgment in the instant case was part of a discussion about proving *prima facie* negligence, and not about strict liability. As we discuss further *infra*, this language from *Everly* is a statement regarding the application of the evidentiary rule of *res ipsa loquitur* as a method of proving *prima facie* negligence.

(In that context, the language in question is indeed pertinent to the issues in the instant case, and we discuss *res ipsa loquitur* as it applies to the instant case *infra* at II.C.)

It was thus error, albeit understandable error, for the circuit court to conclude that the *Everly* case required applying strict liability to Mountaineer.

### 2.

### Strict Liability Generally

If the language in our opinion in *Everly* did not require that the circuit court find that Mountaineer was strictly liable for damages from the escape of natural gas from Mountaineer's gas transmission line, the next question we must address is: absent such a mandate from the *Everly* case, did the circuit court err in applying strict liability to Mountaineer?

First, it should be noted that absent *Everly's* authority, none of our precedents has required the application of strict liability to the *transmission* of natural gas. We recognized this in *Reed v. Smith Lumber Co.*, 165 W.Va. 415, 420, 268 S.E.2d 70, 72–73 (1980), where we said (with citations omitted and emphasis added):

> It is clear from our precedents and those of other states that if a gas company has notice of defects in gas lines, pipes or customers' appliances, that are dangerous to human health and safety, it has a duty to repair the defects or shut off the gas until repairs are made. . . . *We have not held gas companies strictly liable.*

However, in a related area, we have held that the *"accumulation and use* of combustible gas for a private purpose" is an abnormally dangerous activity that gives rise to strict liability without a showing of negligence for any injury proximately caused by such activity. *Peneschi v. National Steel Corp.*, 170 W.Va. 511, 515, 295 S.E.2d 1, 5 (1982) (emphasis added).

In *Peneschi*, we explicitly adopted the *Restatement of Torts 2d* [1976] formulation of the doctrine of strict liability for abnormally dangerous activities. Syllabus Point 1, *Peneschi. See, e.g., Evans v. Mutual Min.,*

199 W.Va. 526, 485 S.E.2d 695 (1997) (strict liability for damages from water impoundment that failed).

In our opinion in *Peneschi*, we discussed and analyzed a number of our past cases in which strict liability was or was not imposed upon dangerous activities and instrumentalities. We noted that in cases where strict liability was not imposed, a party engaged in such activities or employing a dangerous instrumentality was held to "the highest degree of care, a standard commensurate with the dangerousness to be avoided." 170 W.Va. at 517, 295 S.E.2d at 7. We also noted that in cases where strict liability was not imposed upon dangerous activities and instrumentalities, the availability of *res ipsa loquitur* often ameliorated any potential unfairness to an injured party in presenting a claim. *Id.*

It cannot be disputed that cogent arguments exist both for and against the application of strict liability to the dangerous activity of transmitting natural gas. Both sides of the issue were discussed in *Mahowald v. Minnesota Gas Co.*, 344 N.W.2d 856 (Minn. 1984). The majority in that case, which declined to approve of strict liability, said:

> Appellants urge us in this case to make a natural gas distributor who has gas mains in the public streets an insurer of the person and property of its customers, and others, if they sustain damage as a direct result of a gas leak from one of the distributor's gas lines located in the public street.

They invite us to explicitly overrule *Gould v. Winona Gas Co.*, 100 Minn. 258, 111 N.W. 254 (1907), and to implicitly overrule a number of later cases which applied and reaffirmed the rule of *Gould* that a gas distributor's liability for damage resulting · from leaks from mains located in public streets rests on negligence—the duty to exercise reasonable care commensurate with the risk of harm. To do so, we would have to overrule a long line of our own cases and also announce a rule contrary to that prevailing in our sister jurisdictions. A minority of the court feels the time has come to take that step. However, it appears to us that such a departure from general rules of liability of gas distributors is neither advisable nor necessary. Equity in this type of case will better be served by the less drastic measure of shifting to the gas distributor the burden of overcoming an inference of negligence on its part under the doctrine of res ipsa loquitur.

344 N.W.2d at 859.[5]

Dissenting in *Mahowald*, Justice Todd stated:

> In adopting a position which will impose liability on the gas company without establishment of negligence, I do not perceive that a significant change in the law is occurring. It was revealed during oral argument that this was the first case in over 20 years where, if the gas company was not solely responsible for an identifi-

---

**5.** The majority also said in *Mahowald*, 344 N.W.2d at 861–863 (citations omitted):

All jurisdictions, with minor variation, impose a high standard of care on the gas distributor—care commensurate with the risk involved. In the case of escaping natural gas, the risk is great because it is invisible, highly dangerous to person and property and, when it has leached through the soil, odorless.

\* \* \* \* \* \*

The burden of proving that a natural gas company was negligent in the operation of its gas distribution system is indeed onerous. That is true, in part at least, because the gas company does not have complete exclusive control over its distribution lines located on public right-of-ways. Activities, of which the gas company frequently has no notice, are normally taking place on streets over which the company has no meaningful control. Here, for example, the city laid

water and sewer lines in proximity to the gas lines; contractors tapped those mains to make service connections; either the city or the developer reduced the street grade after installation of the gas mains; and the city contracted for street servicing.

\* \* \* \* \* \*

In the ordinary course of events, natural gas does not escape from gas mains in public streets so as to cause explosion. When it does so escape and does result in an explosion, an inference of fault on the part of the gas distribution company is justifiable. Even though the gas company may be faultless, in view of its superior knowledge of the gas distribution system, its access and opportunity to identify persons acting in the vicinity of the gas mains, its inspection and control over the mains, and its responsibility for the safety of the persons and property in the community, the gas company should have the obligation to show it was not negligent or to establish who was.

able act of negligence, a third-party tort-feasor could not be identified. Thus, we are merely shifting the responsibility for establishing the cause of the explosion from the victim to the party in control of the distribution of the gas. In almost every case, except the occasional fact situation present in this case, the gas company will be able to establish that it is solely responsible for the damage or that it is entitled to reimbursement in whole or in part from third party tortfeasors. Considering the nature of the franchise held by the gas company and its ability to distribute its losses, if any, among a broad group of ratepayers, this result is not only equitable, but is demanded by modern concepts of liability without fault.

*Mahowald,* 344 N.W.2d at 864 (Todd, J. dissenting). *See also New Meadows Holding Co. v. Washington Water Power Co.,* 34 Wash.App. 25, 659 P.2d 1113 (1983), *aff'd in part & rev'd in part,* 102 Wash.2d 495, 687 P.2d 212 (1984) (*en banc*) (court divided, majority declining to approve of strict liability for natural gas lines.) *See also* Virginia E. Nolan, Edmund Ursin, "The Revitalization of Hazardous Activity Strict Liability," 65 N.C.L.Rev. 257 (1987).

█ For us to approve of the circuit court's application of strict liability to Mountaineer in the instant case would require us to rather sharply alter our existing law, which we are reluctant to do without a strong reason. We do not perceive that such a reason exists under the circumstances of the instant case. We believe that the combination of the high standard of care which must be observed in the transmission of natural gas (*see* discussion *infra* at II.B.), coupled with the availability of the doctrine of *res ipsa loquitur* in appropriate cases to a party seeking to prove negligence in the conduct of such transmission (*see* discussion *infra* at II.C.,) should ordinarily make it unnecessary to apply the doctrine of strict liability in cases involving explosions caused by leaking natural gas transmission lines. Therefore, we conclude that the circuit court erred in granting summary judgment based on strict liability against Mountaineer, and we reverse its order.

However, this conclusion cannot end our discussion of the proper standard for evaluating and determining the alleged liability of Mountaineer in the instant case. In the instant appeal, the parties and *amici curiae* have devoted many pages in their briefs urging conflicting views of what Mountaineer's alleged liability may be predicated upon, if strict liability is not appropriate. Indeed, the circuit judge in ruling that strict liability applied acknowledged that he might be found to have erred in his reading of the *Everly* case—and stated that if his ruling were reversed on appeal, he hoped that we would return the case with sufficient instructions so that he would not be in error twice.

Moreover, our decision not to uphold the circuit court's application of strict liability is largely predicated upon our conclusion that other principles of law—a high standard of care and *res ipsa loquitur*—can sufficiently address the concerns that argue for strict liability in gas transmission line leak/explosion cases.

For these reasons, we proceed to further discussion relating to the standard of care and *res ipsa loquitur.*

### C.

### *Standard of Care*

The properties of natural gas which make it useful and valuable also make it dangerous. Natural gas contains a great deal of energy—which partially accounts for its utility, and for its ability to do a lot of damage if it explodes. When escaped natural gas mixes with the atmosphere in certain concentrations, the mixture is explosive and easily ignited by a flame or spark.

Natural gas is often transmitted under substantial pressure, so a leak in a gas transmission line can result in the escape of a large volume of gas in a short time. Gas transmission lines are often buried, sometimes quite deeply (in the instant case, it appears that the gas transmission line in question may have been six feet under the surface)—so inspection, maintenance and repair is not simple. Escaping gas can flow easily and quickly though a path of least resistance, which in populated areas is often

**12**

along or through other utility pipes or drains into buildings.

It is a tribute to human ingenuity generally and to the people who work in gas transmission particularly that in spite of this combination of factors which renders transmitting natural gas a particularly and inherently dangerous activity, relatively few natural gas explosions occur, considering how widely gas is transmitted and used.

Nevertheless, explosions do occur, and law books in every jurisdiction are amply stocked with cases involving the sorting out of who should pay for the injuries and damages caused by explosions of gas which leaks from gas transmission lines. This is such a case.

In many such cases, this Court (and others) have recognized and discussed the high duty of care to which an enterprise which is transmitting natural gas through transmission lines must adhere.

Like other states, we "recognize the dangerous character of natural gas and the correlative duty of utility companies that furnish it." *Reed v. Smith Lumber Co.,* 165 W.Va. 415, 418, 268 S.E.2d 70, 71 (1980). It has been said that the installation of natural gas lines is an inherently dangerous activity, *Noack v. B.L. Watters, Inc.,* 410 So.2d 1375, 1376 n. 1 (Fla.App.1982). "[I]n view of the highly dangerous character of gas and its tendency to escape, a gas company must use a degree of care to prevent the escape of gas from its pipes proportionate to the level of danger." 27A Am.Jur.2d Energy & Power Sources, § 373.

■ This Court has said that:

It is the duty of a company transporting and supplying natural gas, to so construct and maintain its pipe lines as to prevent the escape of gas in a manner that will injure the person or property of another.

Syllabus Point 1, *Dowler v. Citizens' Gas & Oil Co.,* 71 W.Va. 417, 76 S.E. 845 (1912).

■ It has also been said and we agree that:

Natural gas is a dangerous commodity and a distributor of natural gas is required to exercise a high degree of care and diligence to prevent injury and damage to the public from the escape of gas from its lines. A distributor of natural gas is required to exercise a degree of care commensurate to the danger involved in the transaction of its business.

&ast; &ast; &ast; &ast; &ast; &ast;

The duty to use due care which a distributor of natural gas owes to the public is a continuing one and one which cannot be delegated to another.

Syllabus Points 1 and 3, *Hammond v. Nebraska Natural Gas Co.,* 204 Neb. 80, 281 N.W.2d 520 (1979).

We therefore hold that natural gas is a dangerous substance and a distributor of natural gas is required to exercise a high degree of care and diligence to prevent injury and damage to the public from the escape of gas. A distributor of natural gas is required to exercise a degree of care commensurate to the danger involved in the transaction of its business. The duty to use due care which a distributor of natural gas owes to the public is a continuing one and one which cannot be delegated to another.

In analogous circumstances, we have held that because electricity is inherently dangerous, its management requires a "peculiarly high level of care." *Miller v. Monongahela Power,* 184 W.Va. 663, 668, 403 S.E.2d 406, 411 (1991). "[A]lthough we have never gone so far as to make electric companies insurers, we have come reasonably close by making it clear that any deviation from the highest possible standard of care is sufficient to impose liability." *Id.*

Thus, in *Bice v. Wheeling Electrical Co.,* 62 W.Va. 685, 693–694, 59 S.E. 626, 629 (1907) we approved of an instruction stating that:

The court instructs the jury that the defendant in this case was not an insurer of the safety of George Bice at the time he received the injury out of which this suit grows, and was only bound to use reasonable care, under all of the facts and circumstances of the case, to guard against injuring him; *but reasonable care under the facts and circumstances of this case means a very high degree of care.* (emphasis in original).

In *Reed,* 165 W.Va. at 420, 268 S.E.2d at 72, we said that it is clear from our precedents and those of other states that if a gas company has notice of defects in gas lines, pipes or customers' appliances that are dangerous to human health and safety, it has a duty to repair the defects or shut off the gas until repairs are made.

In *Long v. City of Weirton,* 158 W.Va. 741, 214 S.E.2d 832 (1975), we recognized that both a gas company and a city could be concurrently negligent and liable for the damages resulting from a gas explosion in a situation where a city's employees damaged a gas line, and the gas company delayed in its response to the leak. We stated:

> As is noted in *Groff v. Charleston–Dunbar Natural Gas Co.,* 110 W.Va. 54, 156 S.E. 881 (1931), quoting from *Siebrecht v. [East River] Gas Co.,* [21 A.D. 110] 47 N.Y.S. 262, 263:
>
>> "Care and prudence required of the defendant watchfulness and vigilance commensurate with the dangerous character of the substance it was distributing, and this involves not only the careful laying of sound pipes, but also requires an efficient system of inspection, oversight and superintendence." *Id.* at 58, 156 S.E. 881.

*Long,* 158 W.Va. at 754, 214 S.E.2d at 844.

In *Canfield v. West Virginia Central Gas Co.,* 80 W.Va. 731, 736, 93 S.E. 815, 816 (1917), we said that:

> A gas company is bound to inspect for discovery of leaks due to defects in materials, deterioration of pipes and valves, displacement or dislocation by accident, the weather and the like, because it knows these things often occur.

We have also said that "[W]hen a gas company has the exclusive use of a pipe line not its own to conduct gas to a consumer, the company assumes the duty of reasonable inspection and maintenance of the line while it is so used." Syllabus Point 1, *Groff v.*

*Charleston–Dunbar Natural Gas Co.,* 110 W.Va. 54, 156 S.E. 881 (1931). In *Groff,* we also said that:

> [t]he question of the [gas company's] liability is not dependent upon their knowledge of the pipe's defective condition or the escaping gas, but upon the observance or neglect of care by them.... If the evidence warrants the view that the service line was broken by a slip of the 3–inch line, then the question is the same, whether the slip resulted from the work done on the regulator or from the looseness of the soil. That question is: What care was exercised by defendant to anticipate and prevent the slip? Did it make reasonable inspection of the line? If so, would the slip or the tendency to slip with its consequent menace to the service pipe have been discovered? If the defendant had notice of, or by the exercise of reasonable care it should have noticed, the instability of the hillside soil, it became its duty to support the 3–inch line properly against that danger. It has been held that "every precaution which is within the bounds of reason" should be taken to guard against a misplacement of gas pipes. Other authorities have said "every reasonable precaution suggested by experience and the known danger of the escape of gas ought to be taken." (citations omitted).

110 W.Va. at 59, 156 S.E. 881, in part quoting from *Dow v. Winnipesaukee Gas & Electric Co.,* 69 N.H. 312, 315, 41 A. 288, 289 (1898).

█ We conclude that when a party engaged in transmitting natural gas is or in the exercise of its high duty of care reasonably should be on notice of excavation or similar activity which could cause leaks in natural gas transmission lines, the party has a duty commensurate with the dangerousness of leaking gas to take all reasonably feasible actions necessary to protect the integrity of the gas transmission lines and the public safety.[6] *See Annotation,* "Liability of Gas

---

6. Thus, when a party is engaged in the dangerous activity of operating a natural gas transmission line and is or should be aware of excavation or similar activity which has the potential to affect the transmission line, such precautions as the review of excavation plans, consultation and

instruction as to proper methods of excavation and backfilling, and careful observation, monitoring, testing and inspection are the sorts of reasonable precautions that may ordinarily be expected of the party in adhering to its high degree of care, especially when the line is located

Company for Damage Resulting from Failure to Inspect or Supervise Work of Contractors Digging Near Gas Pipes," 71 ALR3d 1174 (1976). *See also, Annotation,* "Liability of Gas Company for Personal Injury or Property Damage Caused by Gas Escaping from Mains in Street," 96 ALR2d 1007, § 17 (1964).

### D.

#### Res Ipsa Loquitur

     The availability of the evidentiary rule of *res ipsa loquitur* is an important method of proof, where appropriate, in permitting the fair adjudication of responsibility for injuries caused by dangerous activities and instrumentalities, short of imposing strict liability on parties engaged in such activities or employing such instrumentalities. *Peneschi, supra,* 170 W.Va. at 517, 295 S.E.2d at 7.[7] We have explained the effect of *res ipsa loquitur* as meaning that "in the absence of evidence to the contrary, in *res ipsa loquitur* cases, the mere fact that a damage-causing event occurs ... suffices for liability...." *Id.,* 170 W.Va. at 517, 295 S.E.2d at 7. "[W]hen the essentials of [the rule of *res ipsa loquitur*] are present, evidence of negligence is supplied." *Id.,* 170 W.Va. at 520, 295 S.E.2d at 10 (*quoting Royal Furniture Co. v. City of Morgantown,* 164 W.Va. 400, 405–406, 263 S.E.2d 878, 882 (1980)). It is "clearly an incorrect statement of the law" to say that *res ipsa loquitur* "dispense[s] with the requirement that negligence must be proved by him who alleges it." *Id.*

> [I]n *res ipsa* cases as well as in *Rylands* [*v. Fletcher,* L.R. 3 H.L. 330 (1868) strict liability], negligence need not be proven. When we speak in *res ipsa* terms, we are speaking of negligence: because of the *res ipsa* rule of circumstantial evidence, negligence is presumed until the defendant rebuts the presumption. On the other hand, in *Rylands*-type cases, the basis of the liability is not negligence, but rather the defendant's intentional behavior in exposing others to a risk.

*Peneschi,* 170 W.Va. at 517, 295 S.E.2d at 7.

The rule of *res ipsa loquitur* is rather eloquently expressed in some of our early cases. In *Snyder v. Wheeling Electrical Co.,* 43 W.Va. 661, 667–668, 28 S.E. 733, 735 (1897) we stated:

> This involves the rule or principle of res ipsa loquitur,—the thing itself speaks. A wire charged with a deadly current of electricity falls from its proper place of elevation above the street to the surface of the street, and there, by contact with a man lawfully passing along the highway, kills him with its current. Are we to presume that its fall came that its fall came from some negligence of the owner, unless the circumstances of the case or facts shown by him shall show that its fall is not attributable to his negligence, but from some defect which that reasonable care and prudence proper in the case of such deadly wire was unable to discover, or some accident beyond his control; in other words, from inevitable accident? I answer that the law raises a *prima facie* case of negligence. As stated in that great work, 16 Am. & Eng. Enc. Law, p. 448: "As a rule, negligence is not presumed. But there are cases where the maxim, 'Res ipsa loquitur,' is directly applicable, and from the thing done or omitted negligence or care is presumed." The rule cannot be better stated, in its generality, than as given in *Scott v. Dock Co.* (1865) 3 Hurl. & C. 596: "There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the

---

near areas where people live, travel and work. To impose upon a natural gas transmission company anything short of a high burden of exercising care regarding excavation activity which it has or should have notice or knowledge of near transmission lines would result in materially risking the destruction of lives and property. "Surely such a result is not supported by any reason or authority, in a land of free government,

where [human life and] individual property rights are considered of prime importance." *Whitney v. Ralph Myers Contracting Corp.,* 146 W.Va. 130, 146, 118 S.E.2d 622, 631 (1961).

7. This is not to imply that the application of *res ipsa loquitur* is limited to dangerous activities.

management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care." In those words it is approved in 1895 in *Shafer v. Lacock,* 168 Pa. St. 497, (32 Atl. 44) [1895], a case where two workmen were repairing a roof, having a fire pot, and from it a fire resulted, destroying the house. "When the physical facts of an accident themselves create a reasonable probability that it resulted from negligence, the physical facts themselves are evidential, and furnish what the law terms evidence of negligence, in conformity with the maxim, '*Res ipsa loquitur*,'" is the apt language in which the principle is stated in *Seybott [Seybolt] v. [New York, L.E. & W.R.] Railroad Co.,* 95 N.Y. 562. One man is hurt from the works or property of another, when from the nature of the case, he would not likely have been hurt without negligence of that other. May he not ask of that other an explanation, or, on his failure to give it, then damages for his injury? Take the case where one, in passing along a street, is hurt by a barrel falling from a door above, or by a brick falling from a wall or scaffold, or by a falling shutter or wall, or the like. The mere occurrences in themselves import negligence. Especially take the cases where things of great danger are used in public highways, where multitudes constantly and lawfully pass, their very nature requiring the highest degree and constancy of care, and one is killed from its being out of place or defective, why may we not logically and fairly assume negligence, unless other plausible explanation appears?

We have authorized the use of *res ipsa loquitur* to give rise to a permissible inference of negligence [8] without proof of specific negligent acts in a number of cases involving the transmission of natural gas, and not always in the explosion context.

For example, in *Interstate Drilling, Inc. v. Parcoil Gathering Systems, Inc.,* 199 W.Va. 359, 484 S.E.2d 475 (1997) (*per curiam*) this Court reversed a directed verdict for the defendants at the close of the plaintiff's case. The plaintiff, a gas producer, sought to rely upon *res ipsa loquitur* to establish the negligence of the operator of a natural gas transmission line in causing substantial losses of gas from the defendant's pipeline. The circuit court ruled that the plaintiff had failed to present evidence establishing specific acts of negligence by the transmission line operator and directed a verdict for the pipeline company. We stated that the plaintiff's evidence showed generally that the damages to the plaintiff "would not have occurred to the extent they did had ... [the transmission line operator] exercised due care." 199 W.Va. at 364, 484 S.E.2d at 480. Accordingly, we reversed the directed verdict for the defendant and remanded for proper consideration by the court of the plaintiff's assertion of *res ipsa loquitur.*

In many of our cases involving *res ipsa loquitur,* including cases arising out of gas leak explosions, we have stated that showing "control" or "exclusive control" by the party charged with negligence—over the activity or instrumentality which led to damages—is a prerequisite of invoking the rule of *res ipsa loquitur.*

For example, in Syllabus Point 1 of *Laurent v. United Fuel Gas Co.,* 101 W.Va. 499, 133 S.E. 116 (1926), we stated:

The doctrine of *res ipsa loquitur* cannot be invoked if defendant does not have control or management of the premises or operations where the accident occurred; or where there is divided responsibility, and

---

8. It has been said that where the doctrine of *res ipsa loquitur* creates a permissible inference of negligence (as opposed to a presumption), as has been frequently stated as the majority rule and the rule in West Virginia, it would logically follow that the inference alone would not afford a basis for a directed verdict for the plaintiff, and the question of negligence is ordinarily for the jury. Stuart M. Speiser, "Res Ipsa Loquitur" § 3.8 (1972). However, the same author states that, "At the same time, there may be an exceptional case where the inference of negligence is so strong that no reasonable man could fail to accept it, and plaintiff, will then be entitled to a directed verdict as a matter of law. For example, the case of a human toe in a plug of chewing tobacco...." *Id., citing Pillars v. R.J. Reynolds Tobacco Co.,* 117 Miss. 490, 500, 78 So. 365, 366 (1918) ("... if toes are found in chewing tobacco, it seems to us that someone has been very careless.")

the unexplained accident may have been the result of causes over which defendant had no control.

We stated a three-part test for the invoking of *res ipsa loquitur,* containing the element of "exclusive control," in Syllabus Point 2 of *Royal Furniture Co. v. City of Morgantown,* 164 W.Va. 400, 263 S.E.2d 878 (1980), and it is this *Royal Furniture* test that we have ordinarily referred to in *res ipsa* cases subsequent to *Royal Furniture*[9]:

> Before the doctrine of *res ipsa loquitur* is applicable, three essentials must exist: (1) the instrumentality which causes the injury must be under the exclusive control and management of the defendant; (2) the plaintiff must be without fault; and, (3) the injury must be such that in the ordinary course of events it would not have happened had the one in control of the instrumentality used due care.

In *Royal Furniture,* however, we implicitly acknowledged that to find that a party had "exclusive control" did not literally mean that only the party charged with negligence could physically have affected the activity or instrumentality in question, saying that:

> ... if water tanks and reservoirs used to supply water to a city-owned system or to a private enterprise *can be found* to be under the exclusive control of their owners so as to justify a presumption of negligence under the doctrine of *res ipsa loquitur,* a water main buried two to three feet beneath a city street *must be considered* to be within the exclusive control of the city which owns such water main. (emphasis added).

164 W.Va. at 405, 263 S.E.2d at 882.

We thus recognized in *Royal Furniture* that the element of "exclusive control" could be inferred or supplied by circumstances such as ownership or legally imposed responsibility. And in *Peneschi, supra,* we noted that predicating liability upon whether a defendant had "complete control" over a dangerous activity is circular and unhelpful: "If

complete control were present, there would be no damages resulting in a lawsuit." *Peneschi,* 170 W.Va. at 519, 295 S.E.2d at 9.

Additionally, in *Bronz v. St. Jude's Hosp. Clinic,* 184 W.Va. 594, 402 S.E.2d 263 (1991), we recognized that an "exclusive control" requirement of *res ipsa loquitur* does not connote that such control must be individual and the defendant singular, and we stated that *res ipsa loquitur* can be applicable to multiple defendants. We stated:

> According to Prosser, Torts, 4th Ed., § 39, p. 211, in order to establish exclusive control it is not necessary for the plaintiff to eliminate all other possible causes of the accident. All that is required is that the plaintiff produce sufficient evidence from which a reasonable man could say that on the whole it was more likely than not that there was negligence on the part of the defendant. If the evidence establishes that it was at least equally probable the negligence was that of another, the court should refuse to submit to the jury the negligence of the defendant on the theory of *res ipsa loquitur.*

*Bronz,* 184 W.Va. at 598, 402 S.E.2d at 267, quoting *Bias v. Montgomery Elevator Co. of Kansas, Inc.,* 216 Kan. 341, 343–344, 532 P.2d 1053, 1056 (1975).

In *Bronz,* we also quoted with approval *Gilbert v. Korvette's, Inc.,* 457 Pa. 602, 327 A.2d 94 (1974), one of several decisions which have explicitly adopted the American Law Institute's formulation of *res ipsa loquitur,* set forth in the *Restatement of Torts 2d* [1965] § 328D.

> The Restatement rule, however, disavows the requirement of exclusive control. A party's negligence may be inferred when "other responsible causes ... are sufficiently eliminated by the evidence ..." Exclusive control may eliminate other causes, but the critical inquiry is not control but whether a particular defendant is the *responsible cause* of the injury. Responsibility, of course, may be shared by

---

9. *See, e.g., Interstate Drilling Inc., supra; Cunningham v. West Virginia–American Water Co.,* 193 W.Va. 450, 457 S.E.2d 127 (1995); *Baxter v. Cramco, Inc.,* 188 W.Va. 515, 425 S.E.2d 191 (1992); *Bronz, supra; Miller v. Montgomery Investments, Inc.,* 182 W.Va. 242, 387 S.E.2d 296 (1989); *Rowan v. Barker,* 175 W.Va. 492, 334 S.E.2d 630 (1985); *Adkins v. Slater,* 171 W.Va. 203, 298 S.E.2d 236 (1982).

two or more defendants. Consequently, if *responsibility* is vested in and shared by two or more parties, each may be subjected to liability [under *res ipsa loquitur*]. (citations omitted).

*Bronz, supra,* 184 W.Va. at 597, 402 S.E.2d at 266, *quoting Gilbert, supra,* 457 Pa. at 613–615, 327 A.2d at 101–102 (footnotes omitted).

The *Restatement of Torts 2d* [1965] § 328D, entitled "Res Ipsa Loquitur," provides:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

The comments to Section 328D state in pertinent part:

g. *Defendant's exclusive control....* It is not, however, necessary to the inference that the defendant have such exclusive control; and exclusive control is merely one way of proving his responsibility. He may be responsible, and the inference may be drawn against him, where he shares the control with another, as in the case of the fall of a party wall which each of two landowners is under a duty to inspect and maintain. He may be responsible where he is under a duty to the plaintiff which he cannot delegate to another, as in the case of a landlord who leases premises dangerous to persons on the public highway, which his tenant undertakes to maintain. He may be responsible where he is under a duty to control the conduct of a third person, as in the case of a host whose guests throw objects from his windows. It may be enough that the defendant was formerly in control, at the time of the probable negligence, as in the case of a beverage bottler whose product poisons the consumer, when there is sufficient evidence to eliminate the responsibility of intermediate dealers. Exclusive control is merely one fact which establishes the responsibility of the defendant; and if it can be established otherwise, exclusive control is not essential to a res ipsa loquitur case. The essential question becomes one of whether the probable cause is one which the defendant was under a duty to the plaintiff to anticipate or guard against.

Many courts have ignored or rejected a strict or literal application of a "control" or "exclusive control" test for *res ipsa loquitur,* finding, as we noted in *Peneschi,* that a focus on a party's actual "control" of a dangerous instrumentality can be a misleading and unhelpful approach to ascertaining whether the rule of *res ipsa loquitur* may be applied to the party to create a permissible inference of the party's negligence.

Moreover, there is a substantial trend favoring the liberal use of *res ipsa loquitur* and the elimination of an element of actual "exclusive control" in cases involving damages which result from leaks from natural gas transmission lines. *See generally cases collected in Annotation,* "Res Ipsa Loquitur in Gas Leak Cases," 34 ALR5th 1 (1995).

For example, in *Mahowald v. Minnesota Gas Co., supra,* the majority stated "In a gas explosion case such as here, the gas distributor is responsible for the reasonable inspection and maintenance of its lines. *It is this responsibility for its gas line that constitutes the type of control that establishes this element allowing the application of res ipsa loquitur.*" 344 N.W.2d at 863 (emphasis added).

In *Metz v. Central Illinois Electric & Gas Co.,* 32 Ill.2d 446, 448–50, 207 N.E.2d 305, 307 (1965), a case involving an explosion of gas that leaked from a gas main, the court

held that the requirement of exclusive control for the application of *res ipsa loquitur* does not mean actual physical control at the time of the accident, if the instrumentality is one which is the defendant's responsibility to maintain at all times, and which responsibility cannot be delegated by consent, agreement, or usage.

In *Worden v. Union Gas System, Inc.*, 182 Kan. 686, 324 P.2d 501 (1958), the court held that a plaintiff was entitled to use *res ipsa loquitur* against a contractor defendant who engaged in excavation near a gas transmission line, and against the defendant company that owned and operated the gas transmission line.

In another gas explosion case, *Phillips v. Delaware Power & Light Co.*, 57 Del. 466, 202 A.2d 131 (1964), the court stated that there was no longer a requirement of actual exclusive control for *res ipsa loquitur* to apply. Furthermore, while a paving company might have caused the break, the gas company knew of the paving and had the responsibility to make sure that the paving was not affecting the gas transmission line. As to other causes, such as traffic or weathering, the gas company was required to have knowledge of those possibilities and act accordingly. The court stated:

> Under the facts, it is possible that [the contractor] bears responsibility for causing the break in the main ... but this does not lessen the Power Company's duties and responsibilities to maintain its gas transmitting system in a reasonably safe condition ... The Power Company ... had the reasonable opportunity to inspect and discover defects during the period of street construction....

57 Del. at 469–70, 202 A.2d at 132.

And in *McGowen v. Tri–County Gas Co.*, 483 S.W.2d 1 (Mo.1972), another gas leak explosion case, the court held that exclusive control is merely one fact which can establish the responsibility of a defendant, and if that responsibility can be established otherwise, exclusive control is not essential to the application of *res ipsa loquitur. See also Koppinger v. Cullen–Schiltz & Associates,* 513 F.2d 901, 907 (8th Cir.1975) (*res ipsa loquitur* was properly submitted as to multiple defendants, including city engineer, excavation company, and gas transmission company.) [10]

Compared with cases like the foregoing, and with our more recent cases like *Reed, supra, and Everly, supra,* the holdings and language in many of our older cases dealing with explosions from gas transmission line leaks—and the availability of *res ipsa loquitur* in such cases—manifest a notably more tolerant, "these things happen" approach, and impose stricter burdens upon parties seeking to use *res ipsa.* This difference can probably be explained by improvements in society's ability to use dangerous technology safely and resulting changes in the expectations which society has of people and entities that manage and profit from such technology. *Cf. Peneschi, supra,* (adopting strict liability for abnormally dangerous activities); *cf. also Morningstar v. Black and Decker Mfg. Co.,* 162 W.Va. 857, 253 S.E.2d 666 (1979) (adopting strict liability for defective products).

A case in point is *Redman v. Community Hotel Corporation,* 138 W.Va. 456, 76 S.E.2d 759 (1953). In *Redman,* this Court overturned a $10,000.00 wrongful death jury verdict for Mr. Clyde Redman's widow, Nellie Redman. Mr. Redman was killed by a gas-fired boiler that exploded. Despite the testimony of the state fire marshal that the explosion would not have occurred in the absence of negligence in the maintenance or operation of the boiler, a majority of this Court rejected the application of *res ipsa loquitur.*

Another case in point is *Burk v. Huntington Development and Gas Co.,* 133 W.Va.

---

**10.** It should be noted that a party does not invoke *res ipsa loquitur* at the necessary cost of submitting evidence of specific acts of negligence. In a given case, "both the inference [of negligence provided by *res ipsa loquitur*] and proof [of specific negligent acts or omissions] may be material in determining the existence of primary negligence." *Frye v. McCrory Stores*

Corp., 144 W.Va. 123, 130, 107 S.E.2d 378, 383 (1959). A party may try to prove specific negligent acts or omissions, and also invoke *res ipsa loquitur* if the circumstances warrant, to attempt to prove the negligence of the defendants. *See Pope v. Edward M. Rude Carrier Corp.*, 138 W.Va. 218, 234–236, 75 S.E.2d 584, 593–594 (1953).

817, 58 S.E.2d 574 (1950) in which this Court overturned a $10,000.00 wrongful death (one-year old child) jury verdict against a gas company after an explosion caused by a leaking gas transmission line, based upon the plaintiff's failure to prove specific negligent acts or omissions by the gas company.

In another example, this Court held in *H.B. Agsten & Sons v. United Fuel Gas Co.*, 117 W.Va. 515, 186 S.E. 126 (1936) that *res ipsa loquitur* was not applicable in a gas explosion case, because the cause of the explosion was not traceable to an instrumentality controlled exclusively by the defendant. And the same was true in *Laurent v. United Fuel Gas Co.*, 101 W.Va. 499, 133 S.E. 116 (1926).

In summary, these older West Virginia cases provide additional evidence that a requirement of "exclusive control" in *res ipsa loquitur* cases can lead to rather harsh results, inconsistent with the purpose of the rule—to allow negligence in certain cases to be proved circumstantially.

Additionally, it should be noted that our past formulations of the requirements for the invocation of the rule of *res ipsa loquitur* have another apparent flaw—because they in effect implement the doctrine of contributory negligence, which we discarded in *Bradley v. Appalachian Power*, 163 W.Va. 332, 256 S.E.2d 879 (1979), when we adopted modified comparative negligence.

For example, as indicated previously, Syllabus Point 2 of *Royal Furniture Co. v. City of Morgantown*, says:

> Before the doctrine of *res ipsa loquitur* is applicable, three essentials must exist: (1) the instrumentality which causes the injury must be under the exclusive control and management of the defendant; (2) *the plaintiff must be without fault*; and, (3) the injury must be such that in the ordinary course of events it would not have

happened had the one in control of the instrumentality used due care. (emphasis added.)

This test, taken literally, provides in part (2) ("*the plaintiff must be without fault*") that the slightest degree of fault by a plaintiff will bar a plaintiff from establishing a defendant's negligence, if the plaintiff seeks to rely upon *res ipsa loquitur* to do so. This is a classic formulation of the doctrine of contributory negligence, a doctrine we have abandoned.

It therefore not surprising that the great majority of jurisdictions which have adopted some form of comparative negligence (and the scholarly commentators) hold that a party seeking to utilize *res ipsa loquitur* need not be entirely free of fault with respect to the accident in question. *See, e.g., Giles v. City of New Haven*, 228 Conn. 441, 455, 636 A.2d 1335, 1341 (1994); *Dyback v. Weber*, 114 Ill.2d 232, 239, 500 N.E.2d 8, 11, 102 Ill.Dec. 386, 389 (1986); Prosser and Keeton on Torts, Fifth Edition, § 39, "Res Ipsa Loquitur," p. 254 (1984).

While the issue is not directly presented by the facts of the instant case, we believe that the reasoning of these cases is sound, and that therefore the above-quoted *Royal Furniture res ipsa loquitur* test is an erroneous statement of what our law is, insofar as it implies that a plaintiff who is to any degree at fault in causing an accident is barred from proving the superior negligence of a tortfeasor using *res ipsa loquitur*.[11]

From the foregoing discussion, it appears that past formulations in our law of the rule of *res ipsa loquitur* are unsatisfactory. For example, the *Royal Furniture* test is clearly inadequate in part (1), which mandates "exclusive control" by the party to be charged with negligence—and in part (2), which requires that a plaintiff be faultless. And in

---

11. It appears that in the modified comparative negligence context, the language of the *Restatement* formulation of the *res ipsa loquitur* prerequisites, which *inter alia* requires that "other responsible causes, including the conduct of the plaintiff and third persons, are *sufficiently eliminated* by the evidence" (emphasis added) means that to invoke *res ipsa loquitur*, a party must present evidence from which the jury could find

that the plaintiff was less negligent than any other parties whose negligence, however shown, caused or contributed to the accident—and this showing would be "sufficient elimination" of the plaintiff's responsibility. *Cf. Turk v. H.C. Prange Co.*, 18 Wis.2d 547, 558 n. 2, 119 N.W.2d 365, 372 n. 2 (1963) (*res ipsa loquitur* available if plaintiff can be found less than fifty percent negligent).

the particular context of the instant case, this *Royal Furniture res ipsa loquitur* test would be inadequate for the circuit court of Mineral County to use upon remand.

Rather than expound further glosses, caveats and corollaries. upon our past formulations of *res ipsa loquitur,* we determine to make a more substantial change which we hope and believe will be for the better. In taking such a step, we follow a path established in two cases, one of which, *Gilbert v. Korvette's, Inc.,* 457 Pa. 602, 327 A.2d 94 (1974), we have already mentioned *supra* and which we quoted with approval in *Bronz, supra,* 184 W.Va. at 597, 402 S.E.2d at 266.

In *Gilbert,* after a discussion of the difficulties in Pennsylvania's existing formulations of the *res ipsa loquitur* rule, particularly in the area of requiring "control" and "exclusive control," the Pennsylvania Supreme Court stated:

> The American Law Institute articulates the desired evidentiary rule in section 328D of its Restatement (Second) of Torts (1965). Careful review and considered reflection convince us that the evidentiary rule enunciated in the Restatement is a far more realistic, logical, and orderly approach to circumstantial proof of negligence than the multiple doctrines formerly employed in Pennsylvania. Here, as in other cases, this Court accepts the persuasive authority of the Restatement, and we adopt section 328D as the law of this Commonwealth.

457 Pa. at 611–612, 327 A.2d 94 at 100 (footnotes omitted).

The second case we follow is *Parrillo v. Giroux Co., Inc.,* 426 A.2d 1313 (R.I.1981), where the Rhode Island Supreme Court, in adopting the *Restatement of Torts* 2d [1965] § 328D formulation of *res ipsa loquitur,* stated:

> Dean Prosser, after pointing out that a defendant's negligence does not have to be proved beyond a reasonable doubt, explains that, in dealing with the requirement of exclusive control, there is no necessity for a plaintiff to eliminate all other possible causes of the accident. All that is required is that the plaintiff produce sufficient evidence from which a reasonable man could say that, on the whole, it was more likely than not that there was negligence on the part of the defendant. Prosser refers to the *Kilgore* case as a perfect example of one of the instances in which a strict application of the exclusive-control requirement has led to "ridiculous conclusions;" and "control," he said, if it is not to be "pernicious and misleading," must be considered as a "very flexible term." Prosser, *Law of Torts* § 39 at 218–224 (4th ed.1971).

\*     \*     \*     \*     \*     \*

> Past preoccupation with the exclusive-control requirement has caused this court to lose sight of the fact that exclusive control, like Chief Baron Pollock's reference to "res ipsa loquitur," merely gives recognition to the fact that circumstantial evidence can afford an appropriate and adequate evidentiary foundation for recovery in a negligence action. The time has come that Rhode Island courts, when considering the exclusive-control factor, deemphasize the semantic and exercise the common sensical. It is our considered judgment that the evidentiary rule expressed in § 328(D) of the Restatement (Second) *Torts* (1965) supplies a far more logical and orderly approach to circumstantial proof of negligence than has been formerly employed in this jurisdiction.

426 A.2d at 1319–1320.

Like the *Gilbert* and *Parrillo* courts, we conclude that the formulation of the rule of *res ipsa loquitur* which is stated in the *Restatement of Torts 2d,* Sec. 328D [1965] should ordinarily provide a fairer, broader, and more generally applicable and useful formulation of the rule, and we therefore adopt it. Syllabus Point 2 of *Royal Furniture Co. v. City of Morgantown,* 164 W.Va. 400, 263 S.E.2d 878 (1980) is hereby overruled. The holdings of prior West Virginia cases involving *res ipsa loquitur,* including but not limited to cases relying upon Syllabus Point 2 of *Royal Furniture,*[12] should be viewed in light of and in conformity with the holding in this

12. See footnote 9, *supra.*

opinion, and to the extent that the holding of any case is contrary, such holding is hereby modified.[13]

■ We now hold that pursuant to the evidentiary rule of *res ipsa loquitur*, it may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

■ It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn. It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached. *Restatement of Torts 2d* Section 328D [1965], "Res Ipsa Loquitur." [14]

### E.

#### Claims Against the City of Keyser

*W.Va.Code*, 29–12A–13 [1986], entitled "Venue; parties; real party in interest; service of process," the statute that the circuit court relied upon in dismissing all claims against Keyser, reads in pertinent part[15] as follows:

(c) All actions filed against a political subdivision shall be filed in the name of the real party or parties in interest and in no event may any claim be presented or recovery be had under the right of subrogation.

This section is separate from *W.Va.Code*, 29–12A–5 [1986], the statutory section that sets forth the categories of losses and claims for which a political subdivision is immune, and that we relied upon in *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992), a case where we addressed immunity for claims against a political subdivision where workers' compensation had compensated an injured party. Both statutory sections are portions of the Governmental Tort Claims and Insurance Reform Act, *W.Va. Code*, 29A–1 to –18.

Reduced to its essence, the circuit court's order based on *W.Va.Code*, 29–12A–13(c) [1986] dismissed all of the claims against Keyser (both those of the plaintiffs directly against Keyser, and those of Mountaineer and Parks against Keyser for indemnity and contribution which derived from the plaintiffs' claims against Mountaineer and Parks) because the plaintiffs had to some extent been compensated by their first-party insurance for their injuries—and because the plaintiffs' insurance companies by such payments had subrogation rights against the plaintiffs for some or all of the proceeds of any recovery by the plaintiffs.[16]

13. We recognize that in taking this step, we cannot bring to an end all disputes about the rule of *res ipsa loquitur* or its application; we simply hope that they will occur in a more useful framework. Circuit courts will have to take a common-sense approach and apply the principles in the *Restatement* formulation in a practical fashion on a case-by-case basis—and in light of our past cases, insofar as they are consistent with the *Restatement* formulation. And we will have to afford circuit courts a reasonable discretion as they do so.

14. As to the use of this test in connection with comparative negligence, *see* footnote 11, *infra*.

15. *W.Va.Code*, 29–12A–13 [1986] reads in its entirety:

(a) Actions against all political subdivisions within the scope of this article shall be brought in the county in which the situs of the political

subdivision is located or in the county in which the cause of action arose.

(b) Suits instituted pursuant to the provisions of this article shall name as defendant the political subdivision against which liability is sought to be established. In no instance may an employee of a political subdivision acting within the scope of his employment be named as defendant.

(c) All actions filed against a political subdivision shall be filed in the name of the real party or parties in interest and in no event may any claim be presented or recovery be had under the right of subrogation.

(d) In suits against political subdivisions, the complaint and summons shall be served in the manner prescribed by law for the rules of civil procedure.

16. There was a claim in the instant case directly against Keyser by Nationwide Insurance, based upon Nationwide's payment of insurance proceeds as a result of the explosion, but the circuit

The general term "subrogation" used in *W.Va.Code*, 29–12A–13(c) [1986] implicates diverse circumstances whereby one party may acquire or exercise rights derived from another party's rights—such as sureties, co-debtors, purchasers, persons paying debts of strangers, creditors, and officers. *See* 18 *Michie's Jurisprudence*, "Subrogation" Sections II. 6–36.[17]

■ We are not inclined to reach a far as the circuit court did in the instant case and to read *W.Va.Code*, 29–12A–13(c) [1986] as prohibiting injured parties who have any sort of subrogation relationship with a third party from under any circumstances bringing claims directly or indirectly against a political subdivision. This would be a broad, nebulous and uncertain category of parties who would be entirely excluded from the use of the courts to pursue their claims.

■ However, a narrower construction is possible. It is clear that the language in *W.Va.Code*, 29–12A–13(c) [1986], "in no event may any claim be presented or recovery be had under the right of subrogation" bars claims brought directly in the name of parties that are subrogated to an injured person's claims against a political subdivision.

■ Additionally, construction of *W.Va. Code*, 29–12A–13(c) [1986] to the effect that a plaintiff's recovery against a political subdivision must be reduced by the amount of any first-party insurance proceeds that the plaintiff receives for the same injuries and damages for which a claim is made against the subdivision, is reasonably narrow and certain and is consistent with the overall statutory purpose of the Governmental Tort Claims and Insurance Reform Act, by relieving a political subdivision from paying for damages to the extent that the injured party has been compensated by the party's insurance. This is a position recognized in other jurisdictions, *see S.E.W. Friel Co. v. New Jersey Turnpike Authority*, 73 N.J. 107, 373 A.2d 364 (1977); *see also Grange Mutual Casualty Co. v. Columbus*, 49 Ohio App.3d 50, 550 N.E.2d 524 (1989).

■ For the foregoing reasons, we conclude that *W.Va.Code*, 29–12A–13(c) [1986] bars a direct claim against and recovery from a political subdivision by a party claiming under a right of subrogation to the claim of another party against the subdivision; and also requires that there be an offset of any recovery by an injured plaintiff from a political subdivision in the amount of first-party insurance proceeds received by the plaintiff as compensation for their injuries or damages.[18]

However, the statute does not entirely bar all claims against a political subdivision by a claimant that has to some degree been compensated by their insurance for those injuries or damages. Therefore, we reverse the

court dismissed this claim earlier and it is not an issue in the instant appeal.

17. Absent a clearly expressed legislative intent requiring otherwise, "subrogated" is to be given its usual, ordinary meaning. Whether legal or conventional, subrogation is an equitable remedy. The remedy is for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor. "Subrogation" is a term of legal art which we assume would not be employed by the drafters of the statute unless they intended it to be construed in its normal sense. In its normal sense, subrogation gives the payor a right to collect what it has paid from the party who caused the damage. However, because this right to collect is an equitable remedy, it is subject to equitable principles. *Kittle v. Icard*, 185 W.Va. 126, 130, 405 S.E.2d 456, 460 (1991) (citations omitted).

18. Because there are claims for indemnification and contribution between Parks, Mountaineer, and Keyser, and because we cannot foresee what ultimate determinations may be made as to respective liabilities, if any, of any of the defendants, to the plaintiffs or to each other, it is impossible to speak to the actual effect that our reading of *W.Va.Code*, 29–12A–13(c) [1986] will have as to any offset that must actually be applied to any recovery by the plaintiffs in the consolidated civil actions. We do state that the clear and sole purpose of the statute is to provide financial benefit to political subdivisions. Aside from accomplishing that purpose, the statute is not to be applied to inure to the benefit of private parties that are liable for injuries and damages, nor to prejudice the rights of injured plaintiffs to pursue and obtain all otherwise proper legal remedies and relief available against parties that are so liable, nor to alter legal relations and duties between insureds and insurers.

grant of summary judgment in favor of Keyser.

### III.

*Conclusion*

The judgment of the Circuit Court of Mineral County is reversed and this case is remanded for further proceedings in conformance with the principles set forth in this opinion.

Reversed and remanded.

MAYNARD, Justice, dissenting in part, and concurring in part:

I agree with the majority in this case that the circuit court erred in applying strict liability to Mountaineer. I disagree, however, that the doctrine of *res ipsa loquitur* should be applied in cases involving the transmission of natural gas. Also, I would affirm the trial court's grant of summary judgment in favor of the City of Keyser.

The majority rightly concludes that companies involved in the transmission of natural gas should be held to a high standard of care in light of the dangerous nature of such activity. This standard includes a high degree of care in constructing and maintaining gas lines, as well as constant monitoring of the lines to guard against defects. Once any defects are found, of course a company must respond immediately to correct the defect. The majority states, and I agree, that the slightest deviation in the construction, maintenance, and inspection of gas lines amounts to negligence.

In light of this high and clearly articulated standard of care, I do not agree that the doctrine of *res ipsa loquitur* is needed in cases involving the transmission of natural gas. I believe that it is unnecessary and unfair to defendants in such cases to allow a jury to infer negligence. Instead, I would require that the plaintiffs prove specific acts of negligence just like in any other tort case.

Further, I believe the trial court was correct in granting summary judgment in favor of the City of Keyser. West Virginia cities and towns are spending millions for lawsuit-related costs. A recent statewide survey of municipalities revealed that lawsuits and the threat of lawsuits may cost local taxpayers over $9.4 million per year. Some towns reported spending a sizeable portion of their budgets on litigation-related costs.

Small towns appear to be especially hard hit by lawsuit-related cost the survey shows. More than 25% of responding towns with populations of 2,000 or less reported spending 10% or more of their budgets on lawsuit-related costs. Some towns are spending one-third or more of their budgets. The majority decision will further aggravate this problem.

Accordingly, I dissent in part, and concur in part.